A10A2271. AAF-McQUAY, INC. v. WILLIS.
(707 SE2d 508)

BARNES, Presiding Judge.

This case involves a dispute over a partnership that originally had three partners: AAF-McQuay, Inc. d/b/a McQuay International ("McQuay"), T. W. Ruskin, and Larry R. Willis. McQuay subsequently transferred its interest in the Partnership to Ruskin and another individual, and Willis ceased having any involvement with the affairs of the partnership. Willis then brought this action against McQuay, alleging, among other things, that McQuay had breached the partnership agreement, had breached its fiduciary duties toward him as a partner, and had exhibited wilful and wanton misconduct that would justify an award of punitive damages. McQuay answered, raised multiple affirmative defenses, and counterclaimed on several grounds, including that Willis had breached a guaranty agreement and was liable for attorney fees under OCGA § 13-6-11. In a detailed order on cross-motions for summary judgment, the trial court granted Willis's motion for partial summary judgment in its entirety and denied McQuay's motion for summary judgment against Willis in its entirety. McQuay now appeals, asserting myriad enumerations of error in the trial court's summary judgment order. For the reasons discussed below, we conclude that the trial court erred in granting

summary judgment to Willis on his claim that McQuay violated Section 7.08 (b) of the partnership agreement, since a genuine issue of material fact exists over whether Willis waived his right to invoke, or was equitably estopped from invoking, that section. We affirm in all other respects.

1. McQuay contends that the trial court erred in denying its motion for summary judgment on Willis's claims for breach of the partnership agreement, breach of fiduciary duty, and punitive damages.[1] We disagree.

> When reviewing the grant or denial of a motion for summary judgment, this Court conducts a de novo review of the law and the evidence. To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Footnotes omitted.) *Smith v. Gordon*, 266 Ga. App. 814 (1) (598 SE2d 92) (2004). See OCGA § 9-11-56 (c). Guided by these principles, we turn to the record in the present case.

*Formation and Financing of the Partnership.* The record reflects that McQuay is a global corporation that manufactures, sells, and services heating, ventilating, and air-conditioning ("HVAC") products for the commercial market. In its United States operations, McQuay has a business model that varies from state to state. Its sales business is handled primarily through independent representatives who report to regional sales managers who work for McQuay. Likewise, its service business is mostly operated by entities owned by McQuay. However, in a few states, McQuay has formed joint ventures with local partners in the belief that its business would grow more rapidly under local leadership than if it were 100 percent owned by McQuay.

Georgia was one of the markets in which McQuay chose to pursue a partnership model. In May 1998, McQuay entered into a limited liability partnership agreement with Ruskin and Willis to sell and service McQuay HVAC equipment in Georgia (the "Partnership Agreement"), thereby forming McQuay of Georgia, LLP (the "Partnership"). In connection with forming the Partnership, McQuay

---

[1] In a separate enumeration of error, McQuay makes the generalized assertion that the trial court improperly weighed the evidence and made credibility determinations in ruling on summary judgment instead of treating the evidence as disputed. Rather than independently discuss this enumeration, we will analyze the evidence of record, and the trial court's handling of that evidence, within the context of our discussion of the specific causes of action at issue on appeal.

agreed to transfer to the Partnership its service and warranty work for its HVAC products sold in Georgia (the "Service Business").

Pursuant to the Partnership Agreement, McQuay held a 50 percent interest in the Partnership, Willis held a 25 percent interest, and Ruskin held a 25 percent interest. At the inception of the Partnership, McQuay made a capital contribution of $250,000 and paid the sum of $75,000 each to Ruskin and Willis. Ruskin and Willis in turn each made capital contributions in the sum of $50,000.

Ruskin was appointed as president and Willis as executive vice president of the Partnership. Ruskin and Willis were the "sweat equity partners" who provided the day-to-day management of the Partnership.

In contrast, McQuay served as the "investment banking partner" that financed the operations of the Partnership through a series of loans, including a $500,000 loan for a working capital line of credit memorialized in a promissory note executed by the Partnership (the "Note"). Willis executed a guaranty agreement for the loan, guaranteeing payment of the loan up to the amount of $125,000 or 25 percent of the unpaid obligations, whichever was less (the "Guaranty"). The loan subsequently was modified twice to increase the original principal sum to $600,000, evidencing additional advances made by McQuay. The modified loan was memorialized in the Second Amended and Restated Promissory Note executed by the Partnership (the "Second Amended Note"). In connection with the Second Amended Note, Willis executed an amended guaranty agreement (the "Amended Guaranty").

From its inception, the Partnership had difficulty making payments to McQuay for its loan obligations. Throughout 2000 and 2001, the Partnership had cash flow problems, and several large accounts receivable were not fully collected, which had a substantial impact on the financial condition of the Partnership. Ruskin and Willis argued that these problems were caused in part by McQuay, which they alleged had failed to provide the Partnership with the technical and other related support services required by the Partnership Agreement, and had routinely failed to adequately compensate the Partnership for its performance of warranty service work. In addition, the operation of the Partnership suffered as a result of dissension between Ruskin and Willis, and from "internal resistance" that the Partnership experienced from service personnel within McQuay. Ultimately, the Partnership defaulted in the payment of all of its loan obligations to McQuay.

As a result of the Partnership's default on its loan obligations, McQuay sent letters to the Partnership demanding full payment and threatening to take possession of the collateral. Despite these threats, McQuay did not pursue legal action on the loans or the loan

guarantees. According to McQuay, this was because its ultimate goal was to make the Partnership more profitable and to turn it into a viable business. In contrast, Willis alleged that McQuay had developed a long-term plan to get out of the Partnership and to obtain sole ownership of the Service Business, and that it used the demand letters as part of an effort to "hammer" Ruskin and Willis and squeeze them out of the Service Business. The evidence relied upon by Willis in this regard is discussed below.[2]

*The 2002 McQuay Strategy Document.* Willis relied upon a 2002 internal strategy document produced by McQuay during discovery to show McQuay's long-term plan regarding the Partnership and Service Business. In the document, McQuay noted that while the Partnership had $17 million in sales, it nonetheless had "negative retained earnings," was "not generating cash," and was "limited on further growth without additional cash." McQuay further noted that the Partnership was overdue on its various loan obligations and that "McQuay does not have operating control." Consequently, McQuay proposed that it take steps to obtain a majority ownership interest in the Partnership so that it could establish "control of the company." The document concluded by stating: "Ultimate objective is to divest the sales company and retain ownership of the service business (3-5 years)."

*The Service Business Demand Letter.* In February 2002, McQuay began having internal discussions about how a demand letter concerning nonpayment of one of several outstanding loans to the Partnership could be used to pressure Ruskin and Willis into accepting a proposed restructuring of the Partnership. The loan at issue was memorialized in the Working Capital Promissory Note, and the collateral for the loan consisted of the assets of the Service Business. In a series of internal e-mails, McQuay discussed hand-delivering the demand letter for maximum effect and using the letter as a "hammer" to put Ruskin and Willis "on their heals [sic] [and] cause them to embrace the proposal."

Consistent with this internal e-mail discussion, in May 2002, McQuay hand-delivered a demand letter to Ruskin following a dinner meeting in Atlanta. The letter informed Ruskin that the Working Capital Promissory Note was in default and that McQuay would enforce payment, including taking possession of the collateral and collecting attorney fees and other costs, if the entire amount was

---

[2] It is clear from the record that McQuay hotly contested Willis's version of the facts and presented evidence that provided an alternative theory of what transpired in this case. But on appeal from the denial of McQuay's motion for summary judgment, we are to construe the testimony and documentary evidence in the light most favorable to Willis, with all inferences drawn in his favor. See *Smith*, 266 Ga. App. at 814 (1).

not paid in ten days. When Willis learned of the demand letter the next day, he was "shocked." Ultimately, McQuay never pursued legal action regarding the Working Capital Promissory Note, despite the threat contained in the demand letter.

*The June and October 2002 Proposals.* Approximately one month after the hand-delivery of the demand letter, McQuay made a formal proposal to Ruskin and Willis, dated June 14, 2002, to restructure the Partnership so that it would have a majority ownership interest (the "June Proposal"). A few months later, a second, similar restructuring proposal, dated October 21, 2002, was presented to Ruskin and Willis (the "October Proposal"). According to Willis, several representatives of McQuay warned him that if he did not agree to the proposed restructuring, McQuay would "blow up the business" and sue him to enforce his obligations under the Amended Guaranty.

*The December 2002 Partnership Valuation.* In conjunction with its restructuring efforts, McQuay hired an outside consultant to calculate the Partnership's value. The consultant calculated the fair market value of the Partnership, as of December 10, 2002, to be $2.8 million. However, McQuay never informed Ruskin and Willis about this valuation and instead told them that the Partnership was valued between zero and $1 million, with $1 million being a "generous" valuation.

*The December 2002 Partnership Meeting and Default Letters.* On December 17, 2002, there was a Partnership meeting in which the partners voted on a change in officers and on six resolutions for restructuring the Partnership along the lines of the June and October Proposals. During the meeting, Willis was voted in to replace Ruskin as interim president of the Partnership. The six resolutions proposed by McQuay were not adopted.

McQuay then delivered a letter to Ruskin, dated December 19, 2002, notifying him that several of the outstanding loans were in default, demanding payment of the unpaid balances within 30 days, and threatening to "assume ownership of all of [the Partnership's] assets in any form, wherever located." An executive vice president of McQuay informed one of the Partnership's officers that the purpose of this letter was to "force" Ruskin into accepting a restructuring of the Partnership.

McQuay also delivered a letter to Willis, dated December 19, 2002, notifying him that the $600,000 Second Amended Note was in default. The letter warned that if the Partnership failed to meet its loan obligations under the Second Amended Note, McQuay would look to Willis personally for payment in accordance with the Amended Guaranty.

Later, in a January 20, 2003 letter, McQuay wrote to the

Partnership, noting that the Partnership had "failed to cure its defaults on the various promissory notes" and stating that "McQuay must therefore begin to take steps to satisfy those notes." McQuay went on to request a complete list of the Partnership's assets. Nevertheless, McQuay never began any actions or collection efforts regarding the various demands it made on the Partnership in December 2002 and January 2003.

*The July 2003 Conference Call.* Following the failure of the resolutions at the December 2002 Partnership meeting, McQuay abandoned its plan to acquire a controlling ownership interest in the Partnership and instead attempted to have its interest in the Partnership bought out. On July 1, 2003, a conference call took place between Ruskin, Willis, and several representatives of McQuay. During the call, McQuay placed the Partnership on restricted credit, which meant that McQuay would not ship HVAC parts except for emergencies or cash in advance. McQuay also required the Partnership to prepare an action plan to show how it would remedy its default on the loans. Additionally, McQuay announced that it now wanted to sell its ownership interest and would entertain all reasonable offers. According to an internal company e-mail, McQuay hoped that its proposal to sell its ownership interest would "get some competition going" between Ruskin and Willis.

*The Buyout Proposals.* In August 2003, Willis and Roger Bennett, an officer of the Partnership, presented their joint proposal to purchase McQuay's interest in the Partnership. At the same time, Ruskin and David Glidden, another officer in the Partnership, presented a competing proposal to purchase McQuay's interest. At an August 26, 2003 meeting in Atlanta at Holiday Inn, McQuay warned Willis that the partner whose proposal was rejected by McQuay would need to leave the Partnership and have his interest bought out. McQuay provided a list of what the exiting partner would receive in the form of a buyout. Willis was warned that he would be destroyed "personally, professionally, [and] financially" if he did not agree to these terms. According to Willis, he ultimately reached an agreement with Ruskin and McQuay's representatives during the Holiday Inn meeting that the partner whose proposal was rejected by McQuay would exit the Partnership and be bought out.

Shortly thereafter, McQuay selected the Ruskin/Glidden proposal, subject to the approval of McQuay's parent company and the negotiation of final contract terms. McQuay sent Willis a right of first refusal letter, notifying him that McQuay intended to sell its interest to Ruskin and Glidden, and Willis did not respond to the letter. McQuay sent Willis a follow-up letter stating that his right of first refusal under the Partnership Agreement had expired, and Willis likewise did not respond to that letter.

*Willis's Termination.* On September 24, 2003, Willis e-mailed McQuay with the exact amount he thought he was owed based on the agreement reached at the Holiday Inn about buying out the non-selected partner. On September 26, 2003, at a meeting of the board of directors for the Partnership, Willis was terminated by a 4-1 vote. Willis took steps to transition his customer accounts and began efforts to be paid based on the agreement reached at the Holiday Inn meeting. In a November 5, 2003 e-mail, McQuay's counsel referred to the Holiday Inn meeting and threatened to get "heavy-handed" with Willis if he tried to get more than was discussed at the meeting.

When Willis threatened legal action over the buyout, Ruskin suggested in a February 5, 2004 e-mail to McQuay's counsel and Glidden that Willis should be terminated before he initiated litigation, this time "for cause," to prevent having to pay him anything for his ownership interest under the Partnership Agreement. A lengthy conference call was then held that afternoon, after which McQuay announced the following decision: "Terminate [Willis] for cause. We would like to begin that process before he takes any legal action[ ] so it does not appear that we are doing so in retaliation."

*Transfer of Willis's Interest.* Final negotiations over the Ruskin/Glidden proposal broke down, and McQuay again raised the issue of the Partnership's default on its loan obligations. McQuay also notified the Partnership that it planned to seek an alternative distributor for its HVAC products. Ruskin then filed suit against McQuay on behalf of himself and the Partnership, asserting, among other things, breach of the partnership agreement and breach of the implied covenant of good faith and fair dealing (the "Ruskin Lawsuit"). See *Ruskin v. AAF-McQuay, Inc.*, 284 Ga. App. 49 (643 SE2d 333) (2007). Although Willis was not a party to the Ruskin Lawsuit, his attorney attended a hearing conducted on Ruskin's motion for a temporary restraining order. Ultimately, Ruskin and McQuay reached a settlement, and the trial court in that case entered a final order enforcing its terms. Pursuant to the settlement agreement, McQuay's 50 percent interest in the Partnership was transferred to Ruskin and Glidden in December 2005. McQuay sent Willis another right of refusal letter containing a copy of the settlement agreement, and Willis did not respond.

Today, the Partnership continues to operate in Georgia, but it is no longer the authorized service provider for McQuay. McQuay now operates its own service business office in Georgia in connection with the settlement agreement reached in the Ruskin lawsuit. According to Willis, this reflects that McQuay succeeded in its long-term goal, as reflected in its 2002 internal strategy document, of "divest[ing] the sales company and retain[ing] ownership of the service business."

(a) In Count 1 of his Second Amended Complaint, Willis alleged that McQuay breached Section 7.04 (a) of the Partnership Agreement by not purchasing his Partnership interest after his termination on September 26, 2003. Section 7.04 (a) provides:

> Upon the death, Disability, or termination without cause of a Partner, the Partnership shall buy and the Partner, heirs or representatives, as the case may be shall sell all of the Partner's Partnership interest to the Partnership at the higher of the Book Value Price or the Alternate Price.

McQuay moved for summary judgment on this claim, arguing that Willis was not terminated as a partner and thus the repurchase obligations under Section 7.04 (a) were never triggered. In support of its argument, McQuay pointed out that the minutes from the Partnership board of directors meeting conducted on September 26, 2003 state only that Willis was "removed as Acting President." McQuay pointed to additional evidence inconsistent with Willis being terminated as a partner, including his continued receipt of an Internal Revenue Service Schedule K-1, "Partner's Share of Income, Deductions, Credits, etc.," every year since his alleged termination from the Partnership.[3] In denying McQuay's motion for summary judgment, the trial court concluded that there was conflicting evidence on the issue of whether Willis was terminated as a partner.

The trial court properly denied summary judgment to McQuay. While the Partnership board minutes reflect that Willis was only terminated as acting president, such minutes are not dispositive. As discussed above, Willis presented evidence that around the time of his September 2003 termination, he had learned that McQuay had rejected his proposal to buy out its 50 percent ownership interest, and he had reached an agreement with McQuay and Ruskin at the Holiday Inn meeting that the nonselected partner would be required to exit the Partnership and be bought out. Willis also pointed to the e-mails surrounding his second termination "for cause" as evidence of McQuay's attempt to engineer a way around the obligation to pay

---

[3] McQuay also maintained that in an e-mail dated June 15, 2004, Willis acknowledged that he remained a partner through discussions with Ruskin over a vote proxy. However, in the e-mail, Willis expressly reiterated that he had been terminated without cause as specified in the Partnership Agreement and that his willingness to provide a vote proxy to Ruskin was not intended to remove his claim that he was entitled to payment for his ownership interest. Additionally, McQuay argued that Willis clearly was not terminated as a partner because "a nearly identical situation" occurred in 2002, when Ruskin was removed as president of the Partnership, during which time no one claimed that Section 7.04 (a) had been triggered. But the situation in 2002 arguably was not "nearly identical" to the situation in 2003, since Willis presented evidence that by the time of his termination, the partners had reached an agreement that the nonselected partner would exit the Partnership and be bought out.

for his interest as the exiting partner. The trial court correctly recognized that this combined evidence, when construed in the light most favorable to Willis, meant that the issue of whether McQuay breached Section 7.04 (a) was a jury question.

(b) In Count 2 of his Second Amended Complaint, Willis alleged that McQuay breached its fiduciary duty toward him by attempting to terminate him as a partner a second time "for cause" on February 16, 2004 to avoid having to buy him out under Section 7.04 (a) of the Partnership Agreement. McQuay moved for summary judgment on this claim, arguing that Willis was never terminated as a partner, but the trial court denied the motion on the ground that the evidence on this point was in conflict. The trial court correctly denied summary judgment to McQuay. There was some evidence, interpreted in the light most favorable to Willis, from which a jury could find that Willis had been terminated as a partner, as discussed supra in Division 1 (a).

(c) In Count 3 of his Second Amended Complaint, Willis alleged that McQuay breached its fiduciary duty toward him by using coercive and deceptive tactics in its efforts to restructure the Partnership, with the ultimate goal of obtaining the right to operate the Service Business on its own. Citing to *Westminster Properties v. Atlanta Assoc.*, 250 Ga. 841, 842-843 (1) (301 SE2d 636) (1983), McQuay moved for summary judgment, arguing that a partner who is also a creditor may take actions consistent with its rights as a creditor, and that its actions in this case were consistent with those of any secured creditor. The trial court again denied the motion on the ground that the evidence relating to this claim was conflicting.

The trial court committed no error. Partners owe fiduciary duties to one another to act in the "utmost good faith" and with the "finest loyalty." (Citation and punctuation omitted.) *Hendry v. Wells*, 286 Ga. App. 774, 783 (2) (a) (650 SE2d 338) (2007). See OCGA § 23-2-58. While it is true that a partner who is also a creditor of the partnership may take actions consistent with her rights as a creditor without breaching her fiduciary duties owed to other partners, see *Westminster Properties*, 250 Ga. at 842-843 (1), a partner nevertheless can breach those duties if her actions go beyond that of a simple secured creditor. See *Natpar Corp. v. E. T. Kassinger, Inc.*, 258 Ga. 102, 105-106 (2) (365 SE2d 442) (1988) (partner who was creditor of partnership could be enjoined from foreclosing on the partnership property following default on loan obligation, where the partner wrongfully refused to pay its share of partnership operating expenses, precipitating the default on the loan). Furthermore, the fiduciary duty of good faith prohibits a partner from improperly ousting another partner and appropriating for himself the assets and property of the partnership, and from withholding financial infor-

mation from other partners for purposes of self-dealing. See *Mon Ami Intl. v. Gale*, 264 Ga. App. 739, 743 (3) (592 SE2d 83) (2003); *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 245 Ga. App. 334, 342 (1) (a) (537 SE2d 397) (2000), vacated and remanded, 534 U. S. 801 (122 SC 24, 151 LE2d 1) (2001), reinstated, 254 Ga. App. 598, 599 (1) (563 SE2d 178) (2002).

Here, Willis presented evidence of actions taken by McQuay that went beyond those of a simple secured creditor in its efforts to restructure the Partnership. For example, as previously discussed, Willis came forward with evidence that McQuay had the secret "ultimate objective" of divesting the Service Business from the Partnership and then retaining ownership of that business for its own benefit; that it used default letters as part of its efforts to coerce Ruskin and Willis into accepting a restructuring favorable to McQuay; that it kept secret the December 2002 Partnership valuation and misled Ruskin and Willis about the value of the Partnership in discussions over a restructuring; and that it coerced Ruskin and Willis into making competing proposals to buy out its 50 percent ownership interest by insisting that the nonselected partner would be required to exit the Partnership. These combined facts created a jury question over whether McQuay breached its fiduciary duty owed to Willis such that the trial court properly concluded that summary judgment on this count was inappropriate.

(d) In Count 9 of his Second Amended Complaint, Willis alleged that McQuay breached Section 9.03 (g) of the Partnership Agreement by failing to provide the Partnership with certain management systems, such as accounting, order entry, and sales tracking. That section provides:

> McQuay shall provide the Partnership management systems required by McQuay, including but not necessarily limited to systems of accounting, financial, personnel, order entry, planning, management reporting and control, sales tracking, asset management and control, and such similar or supportive systems and upgrades therefore [sic] as may be mandated by McQuay and which are in addition to or exceed the needs of the Partnership. McQuay shall reimburse the Partnership for all costs incurred by the Partnership in the installation and maintenance of such systems which exceed the costs the Partnership would have incurred but for the installation and maintenance of such additional systems.

McQuay moved for summary judgment, arguing that the language of Section 9.03 (g) was optional, rather than mandatory, and that, in

any event, it never required the Partnership to use a particular management system. The trial court disagreed with McQuay and denied summary judgment on this count.

Summary judgment was properly denied. By its plain terms, Section 9.03 (g) mandated that McQuay furnish the Partnership with the management systems that it required the Partnership to use. And Willis presented evidence that McQuay required the Partnership to use the "D1" accounting system so that McQuay would be able to obtain information from the Partnership that was compatible with its own systems. But there was evidence that the D1 system was never successfully put in place by McQuay, and that without the system, the Partnership could not effectively track its payables, receivables, and accounting functions. Thus, Willis's claim for breach of Section 9.03 (g) was for the jury to decide, as the trial court correctly decided.

(e) In Count 12 of his Second Amended Complaint, Willis sought punitive damages, alleging that McQuay's actions evidenced wilful and wanton misconduct and that McQuay acted with the specific intent to cause him harm. McQuay moved for summary judgment on this count, and the trial court denied the motion, concluding as follows:

> The facts of this case make it impossible for Defendant McQuay to remove the issue of punitive damages prior to trial. Instead, there are numerous facts in the record regarding actions by Defendant McQuay towards Plaintiff that a jury must consider in deciding whether punitive damages should be imposed pursuant to OCGA § 15-12-5.1. Furthermore, the Court also finds that there is enough evidence here for a jury to decide whether Defendant McQuay acted with a specific intent to harm Plaintiff, such that the amount of punitive damages awarded would not be limited to $250,000. . . . Some of the[ ] facts, particularly in the context of a corporate partner dealing with an individual partner, create at a minimum a jury question about whether Defendant McQuay had specific intent to harm Plaintiff, which is why the Court also finds that a jury's consideration of the amount of punitive damages will not be limited to $250,000.

On appeal, McQuay asserts that the trial court's order was erroneous because the court removed the statutory cap on punitive damages "as a matter of law."

We are unpersuaded. Under OCGA § 51-12-5.1 (b), punitive damages may be awarded only if it is established by clear and

convincing evidence that "the defendant's actions showed wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." The Code section further limits punitive damages to a maximum of $250,000 for any tort action other than product liability, unless the factfinder concludes that "the defendant acted, or failed to act, with the specific intent to cause harm." OCGA § 51-12-5.1 (f), (g). If there are facts from which a jury could infer specific intent to harm, a trial court is authorized to deny a defendant's summary judgment motion as to the statutory cap on punitive damages. See *Golden Atlanta Site Dev. v. R. Nahai & Sons, Inc.*, 299 Ga. App. 654, 659-660 (2) (d) (683 SE2d 627) (2009).

The trial court's order, when read as a whole, did not remove from the jury as a matter of law the issue of whether an award of punitive damages would be capped at $250,000. Rather, the trial court simply held that the evidence created a jury question over whether McQuay acted with the specific intent to cause harm, and thus over whether the statutory cap should apply in this case. Accordingly, McQuay's assertion of error lacks merit.[4]

2. In Count 1 of its Counterclaim, McQuay alleged that the Second Amended Note was in default and that there was insufficient collateral to cover the total indebtedness owed by the Partnership, rendering Willis personally liable under the Amended Guaranty. Willis moved for summary judgment on this count, contending that the uncontroverted evidence showed that there was sufficient collateral to cover the amount due under the Second Amended Note, such that his obligations under the Amended Guaranty were not triggered. The trial court agreed with Willis and granted his motion.

The trial court did not err in granting summary judgment to Willis. As explained above, McQuay initially extended a $500,000 loan to the Partnership, memorialized in the Note. The original Guaranty executed by Willis provided:

> Guarantor [Willis] promises to perform his obligations under this Guaranty immediately . . . should Debtor [the Partnership] for any reason fail to pay the Obligations, as such Obligations are evidenced by Creditor's [McQuay's] records, the accuracy of which are hereby expressly stipulated to be conclusive upon Guarantor, within ninety (90) days of their due date and the collateral pledged as security

---

[4] McQuay does not dispute on appeal that Willis presented sufficient evidence to create a genuine issue of material fact over whether it acted with the specific intent to cause harm to him.

for the Obligations is insufficient to satisfy Creditor's claim in full[.]

"Obligations" was defined as the $500,000 loan made to the Partnership by McQuay pursuant to the terms of the Note. "Collateral," in turn, was defined broadly to include all machinery, equipment, tools, parts, fixtures, furniture, furnishings, inventory, accounts, bank accounts, accounts receivable, and other general intangibles of the Partnership.

The Note was twice modified to increase the amount advanced to the Partnership by McQuay, resulting in the Second Amended Note. Contemporaneous with the execution of the Second Amended Note, Willis executed the Amended Guaranty, which stated in relevant part:

Guarantor unconditionally and irrevocably guarantees, when due, payment of the Obligations to the Creditor under the Second Amended Note to the same extent to which Guarantor promised to guarantee the Obligations to Creditor under the Note[.]

When the Amended Guaranty and the terms incorporated therein from the Guaranty are read together, it is clear that the Amended Guaranty applied only if there was a default on the Second Amended Note and the Partnership's collateral was insufficient to cover the amount due under that note. In response to Willis's motion for summary judgment on the guaranty counterclaim, McQuay presented evidence, through an expert's affidavit, that the amount owed under the Second Amended Note with interest was $674,060. The same affidavit established that the value of the collateral was $719,032. Accordingly, the uncontroverted evidence of record showed that the value of the collateral exceeded the amount owed under the Second Amended Note, meaning that Willis was not liable under the Amended Guaranty as a matter of law.

Nevertheless, McQuay argues that under the terms of the Amended Guaranty, a default occurred if the collateral was insufficient to cover the entire outstanding sums owed to McQuay by the Partnership on all of its promissory notes, not simply the amount owed on the Second Amended Note. To support this argument, McQuay focuses on the language incorporated from the original Guaranty stating that a default would occur if "the collateral pledged as security for the Obligations is insufficient to satisfy Creditor's claim in full." McQuay argues that the term "Obligation" refers to the sums owed under the Second Amended Note, but that the term "claim" refers more broadly to the entire outstanding

indebtedness owed to McQuay. Because the total indebtedness owed to McQuay by the Partnership on its various loans was over $1.1 million, McQuay contends that the collateral was insufficient to cover the "claim in full," rendering Willis personally liable under the Amended Guaranty.

We are unpersuaded. The Amended Guaranty mentions only the Second Amended Note, and we decline to extend a guarantor's obligations to loans unmentioned in the guaranty itself. "Georgia courts strictly construe guaranty agreements in favor of the guarantor. And the guarantor's liability cannot be extended by implication or interpretation." (Footnotes omitted.) *Caves v. Columbus Bank & Trust Co.*, 264 Ga. App. 107, 114-115 (3) (b) (589 SE2d 670) (2003). See *Dabbs v. Key Equip. Finance*, 303 Ga. App. 570, 572-573 (694 SE2d 161) (2010). Because "Obligations" is expressly defined as the $500,000 loan memorialized in the Note, it stands to reason that the undefined term "claim" refers to the amount of the "Obligations" that remain unpaid. Any other interpretation would require the terms of the Amended Guaranty to be extended by implication, which the applicable rules of statutory construction forbid. As such, McQuay's interpretation of the Amended Guaranty is misguided, and the trial court correctly granted summary judgment to Willis on the guaranty counterclaim.

3. In Count 6 of its Counterclaim, McQuay sought attorney fees under OCGA § 13-6-11 based on alleged stubborn litigiousness and unnecessary trouble and expense. Willis moved for summary judgment on the counterclaim, and the trial court granted the motion.

McQuay argues that it was entitled to pursue attorney fees predicated on the successful prosecution of its guaranty counterclaim. But, as explained supra in Division 2, the trial court properly granted summary judgment to Willis on the guaranty counterclaim, and "[a] prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim." *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996). As such, attorney fees could not be predicated on the guaranty counterclaim.

McQuay also argues that it may be entitled to pursue attorney fees if it successfully prosecutes its counterclaim for breach of fiduciary duty. With respect to this counterclaim, the trial court found that "there are conflicting facts that demonstrate a bona fide controversy." Where, as here, there is no assertion of bad faith by the opposing party, attorney fees are not warranted if a bona fide controversy exists between the parties. See *Dimambro Northend Assoc. v. Williams*, 169 Ga. App. 219, 224-225 (6) (312 SE2d 386) (1983). McQuay does not challenge on appeal the trial court's finding that a bona fide controversy existed as to the breach of fiduciary duty

counterclaim. Therefore, McQuay's attorney fees claim failed as a matter of law, and the trial court was correct in granting Willis summary judgment.

4. In Count 7 of his Second Amended Complaint, Willis alleged that McQuay breached Section 7.08 (b) of the Partnership Agreement by transferring its 50 percent ownership interest in the Partnership to Ruskin and Glidden in December 2005 as part of the settlement in the Ruskin Lawsuit. That section provides that if a partner attempts to transfer his interest in the Partnership,

> [t]he transferor remains a Partner of the Partnership with all rights to vote and manage unless and until the non-transferring Partners holding at least sixty-six and two-thirds percent (66 2/3%) of the percentage interests in the Partnership consent, in their sole and absolute discretion (which can be unreasonably withheld), to make the transferee a Partner.

It is undisputed that under Section 7.08 (b), McQuay needed 66 2/3 percent of the non-transferring partner interests (Ruskin and Willis were the non-transferring partners) for its transfer to be authorized. But Ruskin and Willis together held only 50 percent, which precluded the transfer McQuay made in settlement of the Ruskin Lawsuit, if Section 7.08 (b) remained in effect. However, McQuay argued that Section 7.08 (b) could not be enforced by Willis based upon the affirmative defenses of waiver, equitable estoppel, mutual departure, and promissory estoppel. Willis moved for summary judgment on his claim that McQuay breached Section 7.08 (b), and the trial court granted the motion after concluding that the uncontroverted evidence showed that McQuay could not succeed on its affirmative defenses.

(a) The trial court erred in concluding that there was no evidence to support McQuay's affirmative defense of waiver. "It is well recognized that a party to a contract may waive contractual provisions for his benefit." (Citations and punctuation omitted.) *APAC-Ga. v. Dept. of Transp.*, 221 Ga. App. 604, 607 (2) (472 SE2d 97) (1996). "A waiver may be established even though the acts, conduct or declarations are insufficient to establish an estoppel. Ordinarily, a waiver operates to preclude a subsequent assertion of the right waived or any claim based thereon." (Emphasis omitted.) *Hyre v. Paxson*, 214 Ga. App. 552, 554 (3) (449 SE2d 120) (1994). If there is conflicting evidence over whether a waiver occurred, the issue is for a jury to resolve. *Oxford Motors Co. v. Niblack*, 183 Ga. App. 771, 772 (360 SE2d 23) (1987). A party's protracted silence, or unreasonable delay in making protest, can raise a fact issue as to

whether she has waived a contractual right. See *DuPree v. South Atlantic Conference of Seventh-Day Adventists*, 299 Ga. App. 352, 354-355 (683 SE2d 1) (2009); *Kusuma v. Metametrix, Inc.*, 191 Ga. App. 255, 257-258 (3) (381 SE2d 322) (1989); *Royal Atlanta Dev. Corp. v. M. D. Hodges Enterprises*, 141 Ga. App. 838, 838-839 (1) (234 SE2d 676) (1977). See also John K. Larkins, Jr., Ga. Contracts: Law and Litigation § 10-1.

Construed in favor of McQuay, the nonmovant in this context, the evidence showed that McQuay informed Willis in September 2003 that he was the nonselected partner and that it had selected the Ruskin/Glidden proposal for buying out its ownership interest, subject to the approval of McQuay's parent company and the negotiation of final contract terms. Then, in January 2004, McQuay sent Willis a right of first refusal letter, notifying him that McQuay intended to sell its interest to Ruskin and Glidden. After the Ruskin Lawsuit was filed, Willis's attorney attended a temporary restraining order hearing in September 2004. Subsequently, in accordance with the settlement agreement reached in the Ruskin Lawsuit, McQuay's 50 percent interest in the Partnership was transferred to Ruskin and Glidden in December 2005. That same month, McQuay sent Willis another right of refusal letter containing a copy of the settlement agreement. Significantly, however, Willis did not protest the transfer of McQuay's ownership interest as a violation of Section 7.08 (b) until he raised the issue in his Second Amended Complaint filed in June 2008.

Willis's "protracted silence raises a fact issue as to whether [he] waived the right to object to noncompliance with [Section 7.08 (b)] by [his] inaction." (Citation and footnote omitted.) *DuPree*, 299 Ga. App. at 354 (failure to protest noncompliance with payment provision "until more than a year later" in an amended answer raised a fact issue over whether a waiver occurred). See also *Kusuma*, 191 Ga. App. at 257-258 (3) (18-month delay in enforcing termination option gave rise to jury question over issue of waiver); *Royal Atlanta Dev. Corp.*, 141 Ga. App. at 838-839 (1) (failure to invoke contractual right until "a full year after the right matured and nine months after the commencement of litigation" created a jury question over the issue of waiver). Therefore, the trial court committed reversible error by deciding the waiver issue as a matter of law, and thus in granting summary judgment to Willis on his claim for breach of Section 7.08 (b) of the Partnership Agreement. A jury must resolve whether Willis's delay in protest resulted in a waiver of his contractual rights.

(b) The trial court likewise erred in concluding that there was no evidence to support McQuay's affirmative defense of equitable estoppel. A party may be equitably estopped from raising a particular claim or defense "where there is some intended deception in the

conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury." (Punctuation and footnote omitted.) *Smith v. Direct Media Corp.*, 247 Ga. App. 771, 773 (1) (544 SE2d 762) (2001). "The existence of estoppel is generally a question for the factfinder to resolve." (Citation and punctuation omitted.) *Carragher v. Potts*, 300 Ga. App. 735, 738 (1) (d) (686 SE2d 348) (2009).

*Smith*, 247 Ga. App. at 773-774 (1), provides guidance for the present case, where we upheld the trial court's finding in a bench trial that an equitable estoppel had arisen, sufficient to find the defendant liable on an advertising contract, based upon the plaintiff's reliance on the defendant's conduct. We noted that the defendant had engaged in extensive negotiations and participated in several meetings with the plaintiff over a proposed advertisement without ever indicating to the plaintiff that he did not intend to be bound by the advertising contract because he had never signed the order form. Id. at 774. We found significant the fact that before printing the advertisement, the plaintiff sent the defendant a proof of the advertisement which stated that a failure to return the proof would constitute acceptance. Id. We concluded that in light of the "considerable working relationship" between the parties and the defendant's "acknowledgment that he received the advertisement proof," the defendant's "failure to return the proof, if not intentional, was certainly misleading." Id.

The instant case is sufficiently similar to *Smith* to convince us that a jury issue exists over whether Willis is equitably estopped from invoking Section 7.08 (b). Similar to the situation in *Smith*, Willis engaged in numerous negotiations and participated in several meetings over the buyout of McQuay's ownership interest and had a considerable working relationship with McQuay based on their years together as partners. Similarly, just as the defendant in *Smith* was sent an ad proof with the statement that failure to return it would constitute acceptance, Willis was sent two separate right of first refusal letters indicating that the transfer of McQuay's ownership interest to Ruskin and Glidden would proceed on a date certain absent a response from Willis. Hence, as in *Smith*, the evidence in this case would authorize a jury to find that Willis's conduct was tantamount to "such gross negligence as to amount to constructive fraud." Id. at 773-774.

Additionally, there was evidence from which a jury could find that McQuay changed its position to its detriment in reliance upon Willis's conduct, since it entered into an agreement with Ruskin and Glidden to sell its ownership interest, and ultimately transferred that interest, while being misled into believing that Willis would not rely upon Section 7.08 (b) to undermine the transfer. Furthermore,

a jury could find that McQuay's belief was reasonable, in light of Willis's failure to invoke or even mention Section 7.08 (b) until several years after the intense negotiations and then transfer of McQuay's ownership interest to Ruskin and Glidden.

Willis nonetheless contends that equitable estoppel is inapplicable because McQuay's "selling [of] its Partnership interest in a lawsuit that did not include Willis" demonstrated that McQuay was acting in bad faith toward Willis. It is true that because estoppel is a creature of equity, a party who claims the benefit of an estoppel must have acted in good faith and must have been free of fraud in the underlying transaction. See *Kothari v. Patel*, 262 Ga. App. 168, 175 (4) (585 SE2d 97) (2003). But the present case involves conflicting evidence on the issue of McQuay's good faith in its dealings with Willis in the Ruskin Lawsuit, since there was evidence that Willis's counsel attended and spoke at a critical hearing in the Ruskin Lawsuit, and thus evidence from which a jury could infer that Willis was made aware of that litigation, even if he was not included as a party.

For these reasons, a genuine issue of material fact existed over whether Willis was equitably estopped from invoking Section 7.08 (b). Thus, the trial court should not have granted summary judgment to Willis on this issue.

(c) In contrast, the trial court correctly concluded that there was no evidence to support McQuay's affirmative defenses of mutual departure and promissory estoppel. Mutual departure requires the receipt or payment of money or some other sufficient consideration, however slight, to support a departure from the contractual terms. See OCGA § 13-4-4; *Turem v. Sinowski & Jones*, 195 Ga. App. 829, 829-830 (1) (395 SE2d 60) (1990); *Southwest Plaster & Drywall Co. v. R. S. Armstrong & Bros. Co.*, 166 Ga. App. 373, 374 (304 SE2d 500) (1983); *Lester v. Trust Co. of Ga.*, 144 Ga. App. 526, 527 (1) (241 SE2d 633) (1978). McQuay does not contest that consideration is a requirement for a mutual departure, and there is no evidence of record that there was any receipt or payment of money or other consideration provided to Willis for a departure from the terms of the Partnership Agreement. It follows that McQuay's affirmative defense of mutual departure failed as a matter of law.

To establish promissory estoppel, McQuay must come forward with evidence that Willis made a promise about Section 7.08 (b), see *DPLM, Ltd. v. J. H. Harvey Co.*, 241 Ga. App. 219, 221 (1) (526 SE2d 409) (1999), but there is no evidence that any such promise was made in this case. As such, the trial court correctly concluded that McQuay could not succeed on its affirmative defense of promissory estoppel.

In sum, we affirm the trial court's denial of summary judgment to McQuay on Willis's claims for breach of the partnership agree-

ment, breach of fiduciary duty, and punitive damages. We also affirm the trial court's grant of summary judgment to Willis on McQuay's counterclaims for suit on a guaranty and attorney fees and on McQuay's affirmative defenses of mutual departure and promissory estoppel. However, we reverse the trial court's grant of summary judgment to Willis on his claim for breach of Section 7.08 (b) of the Partnership Agreement, since genuine issues of material fact existed with regard to McQuay's affirmative defenses of waiver and equitable estoppel.

*Judgment affirmed in part and reversed in part. Blackwell and Dillard, JJ., concur.*

DECIDED MARCH 4, 2011.

*Howick, Westfall, McBryan & Kaplan, Susan L. Howick, Michael C. Kaplan*, for appellant.
*Beal & Blitch, James D. Blitch IV*, for appellee.