**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and COOMER, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**November 2, 2020**

# In the Court of Appeals of Georgia

A20A0897. LAMBETH et al. v. THREE LAKES CORPORATION.

MERCIER, Judge.

Spencer and Sara Lambeth filed an action for injunctive and monetary relief against Three Lakes Corporation ("TLC"), of which the Lambeths are members, alleging that TLC breached its fiduciary duty and its duty of care to its members to maintain lakes adjoining their property. The Lambeths appeal the grant of summary judgment to TLC. For the reasons that follow, we reverse.

1. The Lambeths contend that the trial court erred by granting summary judgment to TLC when the evidence, viewed in a light most favorable to them as non-movants, show the existence of genuine issues of material fact. We agree.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c). The moving party must demonstrate that no genuine issue of material fact exists. *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 204 (1) (707 SE2d 508) (2011).

> Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

*Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citations and punctuation omitted).

Viewed in the light most favorable to the Lambeths, the record shows the following. The Lambeths purchased a home in the City of Sandy Springs in 2004. The Lambeths's property adjoins one of three lakes in the Lake Forest subdivision. There is an upper lake, a middle lake, and a lower lake, and each lake has a dam; the Lambeths's property adjoins the lower lake. The subdivision is located on the border between the City of Sandy Springs and the City of Atlanta.

2

TLC was created in 1964 with the object, pursuant to its corporate charter, to "hold the legal title to and maintain for the benefit of its members . . . a tract of land, on which are presently located three lakes, which abut other real estate owned by the members of this corporation." "Each person who owns title to any of the lots adjoining the three lakes . . . shall be a member of this corporation." TLC is governed by a Board of Trustees with "the power to make reasonable rules and regulations regarding the use and maintenance of the property of the corporation." TLC owns the lakes and shares ownership of the dams with several parties, including the City of Sandy Springs and the City of Atlanta (the Cities).

Shortly after purchasing the property, Spencer Lambeth, who had experience working with dams, personally inspected the lakes and dams and observed that the upper lake had debris clogging a standpipe and that water was flowing over the emergency spillway. He discussed his observations with TLC, which took no overt action regarding the overflow. In 2006, Spencer Lambeth inspected the lakes and dams with a TLC Board member, Neal Sweeney. The upper dam's primary spillway was blocked, causing the lake to continue to flow over the emergency spillway. Sweeney summarized the findings in an e-mail to the TLC Board.

The Board hired an engineer (Mike Ballard) to visually evaluate the three dams. In his November 2008 report, the engineer noted various deficiencies in all three dams and stated that, under the regulations of the Georgia Environmental Protection Division (EPD) Safe Dams Program, the lower lake dam would likely be classified as a "Category 1 (high hazard) dam" if inventoried. The engineer recommended, among other things, the removal of all trees and unsuitable vegetation from the slopes and the flattening of the downstream slope on the lower dam. To Spencer Lambeth's knowledge, no action was taken by TLC in response to the report.

In March 2009, after conducting a dam breach analysis of the lower lake dam for the Georgia Safe Dams Program, an engineering firm (Golder Associates) issued a report to the EPD reclassifying the lower lake dam as a Category I dam. In its report, the firm concluded that a failure of the lower lake dam would affect eleven buildings and flood area residences, that at least ten structures were located within the breach inundation zone, and that the dam posed a significant risk of destruction and loss of life. In May 2009, the EPD notified TLC by certified letter of the reclassification, informing TLC that the reclassification was based on a dam failure flood analysis that showed possible flooding of homes and probable loss of life. The letter set forth the actions that the dam owners would need to undertake to have the

4

dam reclassified as a Category II dam. It also stated that a permit would be required from the EPD for the operation of the dam, and that a dam operation permit application must be filed within 180 days. No permit application was filed.

In September 2009, TLC sent a letter to the EPD responding to the May 2009 letter. In it, TLC did not challenge the reclassification, stating that "at some point someone" would be expected to repair the dam, but that TLC only owned part of the dam and did not believe it had the right or obligation "to expend further resources toward repair of the Dam."

In May 2012, on behalf of the City of Sandy Springs, Schnabel Engineering assessed all three dams and issued a report stating that the lower lake dam does not meet design standards for a Category I dam. In May 2013, EPD sent a letter to TLC following an annual inspection and noted that the lower lake dam was"still in the same condition as observed in previous inspections," that the deficiencies needed to be addressed, and that TLC was responsible for inspecting the dams and filing reports with EPD.

In April 2015, after being hired by TLC to review Schnabel Engineering's 2012 report, Carter Engineering (Brian Kimsey) conducted a visual inspection of the lower lake dam and a review of the 2012 report. In its May 2015 report, Carter Engineering

agreed with the majority of the findings in Schnabel Engineering report and recommended "working closely with the [Cities] to establish . . . an acceptable end product that meets the Safe Dams Program regulations[.]"

Between 2015 and 2016, representatives of the City of Sandy Springs began removing trees from TLC property and draining the water from the lower lake. The former lake became a dry lake bed, overgrown with weeds.

The Lambeths filed the underlying action against TLC alleging that TLC breached its fiduciary duties and duty of care by failing to take actions necessary to protect its property interests and the interests of its members. The Lambeths alleged that TLC failed (from 2009 through 2017) to protect its and its members' interests as required by the corporate charter by, inter alia, failing to properly maintain the lakes and dams, allowing trees and vegetation to grow on all three dams, allowing certain deficiencies to exist, failing to inspect or determine the condition of the dams, and failing to comply with EPD's requirements regarding dam permits and inspections. In Paragraph 57 of the complaint, the Lambeths listed 20 examples of TLC's alleged failures to take necessary actions to protect the interests of the corporation and its members. Those allegations included, among others, the failure to address instances of trespass by Sandy Springs's contractors, failure to seek permission of members

6

before allowing Sandy Springs's representatives to undertake activities impacting their properties, failure to address the unsafe conditions and deficiencies of the dams, failure to maintain control of TLC property and the relinquishment of control to the Cities, and failure to participate in decision-making processes regarding work related to the lower lake and dam. The Lambeths sought monetary damages (including damages for diminished property value) and injunctive relief. Regarding the latter, they requested a temporary and permanent injunction requiring TLC to take certain actions to fulfill its fiduciary responsibilities to its members and prevent continuing harm, such as restoring the water level of the lower lake, obtaining a dam operation permit and outlining a plan to address dam deficiencies.

TLC moved for summary judgment, arguing that it is entitled to judgment as a matter of law based on, inter alia, the "business judgment rule," and the Lambeths's failure to establish trespass, prove damages, state a claim, prove TLC's ownership and establish TLC's duty of care. In their response, the Lambeths stated that they primarily sought injunctive relief, but that they also sought damages based on TLC's mismanagement and breach of its duty to defend its property, protect its assets, and maintain the lakes and dams. The Lambeths pointed to the corporate charter and to evidence showing that TLC owned the lakes and shared ownership of the dams, failed

to address safety issues with the lakes and dams, and failed to participate in planning or design decisions affecting the property. The Lambeths also cited evidence that TLC's failures resulted in the lower lake being drained and their property value decreasing.

In granting TLC's motion for summary judgment, the trial court entered an order finding that TLC was entitled to summary judgment based on the business judgment rule and the Lambeths's failure to show damages.

"It is well settled that corporate officers and directors have a fiduciary relationship to the corporation and its shareholders and must act in good faith." *Glw Int. Corp. v. Yao*, 243 Ga. App. 38, 42 (3) (c) (532 SE2d 151) (2000). The corporation and its officers have a fiduciary duty to protect corporate property. *Clarence L. Martin, P.C. v. Chatham County Tax Commr.*, 258 Ga. App. 349, 351 (574 SE2d 407) (2002).

> [T]he business judgment rule . . . generally precludes claims against officers and directors for their business decisions that sound in ordinary negligence, except to the extent that those decisions are shown to have been made without deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which the decisions are based, or in bad faith.

8

*FDIC v. Loudermilk*, 295 Ga. 579, 585 (1) (761 SE2d 332) (2014).

This rule is embodied in OCGA § 14-2-830, which pertinently provides that a director of a business corporation shall perform his or her duties "in good faith and with the degree of care an ordinarily prudent person in a like position would exercise under similar circumstances." OCGA § 14-2-830 (a). "In performing his or her duties, a director may rely upon . . . [i]nformation, . . . opinions, reports, or statements provided by . . . legal counsel . . . or other persons as to matters involving the skills, expertise, or knowledge reasonably believed to be reliable and within such person's professional or expert competence." OCGA § 14-2-830 (b). Finally,

> [t]here shall be a presumption that the process a director followed in arriving at decisions was done in good faith and that such director has exercised ordinary care; provided, however, that this presumption may be rebutted by evidence that such process constitutes gross negligence by being a gross deviation of the standard of care of a director in a like position under similar circumstances.

OCGA § 14-2-830 (c).

TLC asserts that the business judgment rule defeats all of the Lambeths's claims because TLC sought the advice of three attorneys in deciding how to proceed regarding the lower dam and the Cities's actions. Specifically, TLC states that it

9

consulted multiple lawyers regarding its ownership interest in the lower lake dam "and how to proceed in light of [the City of Sandy Springs] breaching this dam and draining most of the Lower Lake." According to TLC, the lawyers advised it that "it was in TLC's best interest to 'stay the course' and not engage in bringing any legal action as it would cause a delay in repair of the dam, [for] which the Cities agreed to pay."

However, the record citations to which TLC points show, at most, that it relied on legal advice regarding the Cities's draining of the lake and whether TLC should cooperate with or sue the Cities regarding the planned and/or actual act of draining of the lake. Notably, the Lambeths did not specifically allege a claim based on TLC's failure to sue the Cities. Moreover, none of the cited pages shows that TLC relied on its attorneys' advice regarding any of the other failures alleged by the Lambeths, many of which occurred prior to the Cities draining the lake.[1] As detailed above, the

---

[1] Although TLC purports in its brief to provide citations to the appellate (electronic) record to support its assertions, its citations do not include the volume number and the PDF page number within that volume. See Court of Appeals Rule 25 (c) (3). We note that the record in this case consists of 13 volumes and nearly 3,500 pages, and we remind counsel that it is not the function of this Court to cull the record on behalf of a party; this is particularly true in a case such as this, with a voluminous record. See *In/Ex Systems v. Masud*, 352 Ga. App. 722, 722-723 (1) (835 SE2d 799) (2019). Such briefs hinder this Court in determining the substance and basis of a party's contentions and may well prejudice the party. Nonetheless, in this case we

Lambeths set out in their complaint numerous allegations of TLC's breaches, neglect, and failures to act in accordance with its fiduciary duties (e.g., the failures to properly maintain the lakes and dams, to determine the condition of and address unsafe the condition of the dams, and to comply with dam regulations such as obtaining a dam operating permit). TLC has not shown that the business judgment rule applies to claims based on any of those allegations. Moreover, the Lambeths have pointed to evidence showing a genuine issue of material fact regarding TLC's alleged breach of fiduciary duties and negligence, including evidence of damages. Thus, the trial court erred by granting summary judgment to TLC.

2. Because we reverse the grant of summary judgment, we need not address the Lambeths's remaining enumerated errors.

*Judgment reversed. Miller, P. J., and Coomer, J., concur.*

---

have located and reviewed the record citations.