**THIRD DIVISION**
**MILLER, J.,**
**RAY and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 19, 2014**

# In the Court of Appeals of Georgia

A12A2516. ROLLINS et al. v. ROLLINS et al.

RAY, Judge.

This case returns to us from the Supreme Court of Georgia. It is an appeal from the trial court's ruling on cross-motions for summary judgment in a case alleging, inter alia, breach of trust and breach of fiduciary duty. The suit was brought by four siblings in the Rollins family,[1] who are the beneficiaries of several trusts (the "Beneficiaries"), against their father, Gary W. Rollins, and their uncle, R. Randall Rollins, individually and as trustees of the trusts at issue, as well as a family friend, Henry B. Tippee, in his capacity as a trustee of the trusts at issue (collectively the "Appellees"). The case presents two overarching questions to be viewed through the

---

[1] The siblings are Glen W. Rollins, Ruth Ellen Rollins, Nancy Louise Rollins, and O. Wayne Rollins II.

lens established by our Supreme Court: (1) whether the Beneficiaries are entitled to receive an accounting of various corporations and partnerships (the "Family Entities") held within the trusts, and (2) and whether actions taken by the Appellees in their capacity as corporate entity managers – rather than in their capacity as trustees per se – amounted to breaches of trust and fiduciary duty.

1.    *Procedural History.*

(a) *Fiduciary standard for actions taken at the Family Entity level*.

The trial court granted the Appellees' motion for summary judgment and denied the Beneficiaries' motion for partial summary judgment on the issue of whether the Appellees had breached their fiduciary duties and duties of trust in their management of the Family Entities. The trial court determined, inter alia, that the Appellees' actions were consistent with the trust agreements and the settlor's intent. Specifically, the trial court found that when decisions were made at the Family Entity level, rather than at the trust level, the Beneficiaries "should not be treated any differently than individual interest holders" in the Family Entity at issue.

On appeal, this Court determined that the Appellees would be "held to trustee-level fiduciary standards of care as to their actions related to the Family Entities, which they control, and which are held within the trusts at issue." (Footnote omitted.)

2

*Rollins v. Rollins*, 321 Ga. App. 140, 150 (2) (a) (741 SE2d 251) (2013) (*Rollins I*).

The Supreme Court reversed in part, vacated in part, and remanded the case to us with

direction. *Rollins v. Rollins*, 294 Ga. 711 (755 SE2d 727) (2014) (*Rollins II*). We

therefore vacate our prior opinion to the extent the Supreme Court determined that

we applied an incorrect fiduciary standard, and we now consider the case as directed.

In *Rollins II*, the high court found that although our holding "may be

appropriate as a general rule,[2] it is inappropriate in this case both because the cardinal

rule in trust law is that the intention of the settlor is to be followed, and because the

trusts hold only a minority interest in the family entities." (Citations and footnote

omitted.) Id. at 714 (2). The Supreme Court determined that "where, under the terms

of a trust, the trustee is put in control of a corporate entity in which the trust owns a

minority interest, the trustee should be held to a corporate level fiduciary standard

when it comes to his or her corporate duties or actions." Id. at 716 (2).

On remand, we analyzed the issues presented in light of the fiduciary standard

as delineated by the Supreme Court, and we again find fact questions requiring that

we reverse the trial court's grant of the Appellees' motion for summary judgment and

---

[2] The Supreme Court did not, at this juncture, define the parameters of the "general rule," leaving unclear exactly when or how a trustee-level fiduciary analysis should be applied in similar situations.

3

its denial of the Beneficiaries' motion for partial summary judgment, and remand the case for the trial court's further consideration.

(b) *Accounting*.

The trial court, inter alia, granted the Beneficiaries' partial motion for summary judgment regarding breaches of trust and fiduciary duty premised on the Appellees' failure to provide an accounting of trust assets, but it denied all further relief on this issue. It also granted the Appellees' motion for summary judgment as to the Beneficiaries' further claims for relief related to the accounting claim. Those further claims, inter alia, sought an order requiring an accounting and also requested a "third-party master or receiver" to review the books of the Family Entities held within the trusts.

We reversed in *Rollins I*, supra at 146 (1), finding that the Beneficiaries were entitled to an accounting of the trustee-controlled family entities held as assets in the trusts, and we remanded the case on this issue. Our Supreme Court in *Rollins II*, supra at 713-714 (1), vacated our judgment on the issue of an accounting and remanded the case to us with direction. We therefore vacate our earlier decision on this point and proceed, according to the Supreme Court's instruction, to consider whether the trial court properly exercised its equitable discretion in denying the accounting.

4

In sum, we again reverse the trial court's grant of summary judgment to the Appellees and its denial of partial summary judgment to the Beneficiaries on the issue of an accounting of the family entities that are within the Trustees' control and held as assets within the trusts. We further remand this issue to the trial court so that it may reconsider its ruling in light of our determination in Division 3.

2. *Facts*.

The facts of this case are set out in detail in *Rollins I*, supra at 140-142. In summary, O. Wayne Rollins (the "Settlor") established a number of trusts, including the five at issue in this litigation. In 1968, he established the irrevocable Rollins Childrens Trust ("RCT") for the benefit of his grandchildren and great-grandchildren. . The Beneficiaries in the instant case are four of the nine grandchildren who benefit from the RCT. The Settlor's sons, Gary and Randall, as well as the Settlor's friend, Tippie, are the trustees. The RCT originally was funded primarily with Rollins, Inc. stock. In the 1970s and 1980s, in a bid to limit tax liability, the Settlor created several entities to hold assets within the trust structure of the RCT: ROL, Inc., LOR, Inc., the Rollins Grandchildren's Partnership, ("RGP"), and the Rollins Holding Company ("RHC") (collectively, the "Family Entities").

5

In 1986, again to limit tax liability, the Settlor established nine irrevocable Subchapter S-Trusts for the benefit of his grandchildren, including the four Beneficiaries here. Gary is the sole trustee of the S-Trusts at issue. The original assets in the S-Trusts were interests in LOR, Inc. In 1988, the Settlor created another family entity called the Rollins Investment Fund ("RIF"), a partnership that is held within the S-Trusts, again to minimize tax consequences.

In 2010, the four Beneficiaries sued the Appellees alleging breach of trust and breach of fiduciary duty and seeking, inter alia, an accounting of the Family Entities. In general, they alleged that after the Settlor's death, Gary and Randall changed the structure, leadership, holdings, and distribution methods used within the Family Entities held within the S-Trusts and the RCT. They argued that Gary and Randall shifted power from the Beneficiaries to themselves, made the Beneficiaries' interests in the Family Entities illiquid and nontransferable, established non pro rata distribution systems in contravention of the Settlor's intent, and refused to provide a further accounting of Family Entities held within the trusts.[3]

3. *Management of the Family Entities held with the Trusts*.

---

[3] The Appellees, after the Beneficiaries filed suit, did provide an accounting of the S-Trusts and the RCT, but not of the Family Entities held within those trusts.

The Supreme Court determined that where, as here, "under the terms of a trust, the trustee is put *in control*[4] of a corporate entity in which the trust owns a *minority interest*, the trustee should be held to a corporate level fiduciary standard when it comes to his or her corporate duties and actions." (Emphasis supplied.) *Rollins II*, supra at 716 (2). The Supreme Court found that its holding that the Appellees may act in a dual role as entity managers and as trustees was "buttressed by the legislature's 2010 amendment to the Trust Code," and cited OCGA § 53-12-246 (b). *Rollins II*, supra at 716 (1). OCGA § 53-12-246 (b) provides in its entirety that:

> This Code section shall not preclude the following transactions, if fair to the beneficiaries: (1) An agreement between a trustee and a beneficiary relating to the appointment or compensation of the trustee; (2) Payment of reasonable compensation to the trustee; or (3) Performing and receiving reasonable compensation for performing services of a managerial, executive, or business advisory nature for a corporation or other business enterprise, where the trust estate owns an interest in the corporation or other business enterprise.

[4] Gary and Randall have testified they retain total control over the Family Entities in which the trusts are minority shareholders.

7

(a) *Breach of fiduciary duty and breach of trust for actions taken at the entity level.* The parties dispute whether Gary and Randall exceeded their authority, and whether they breached fiduciary duties as well as duties of trust, in administering the Family Entities held in trust and in distributing income and principal. They debate, among other things: the propriety of non pro rata distributions; establishment of a code of conduct that conditions distributions on the Beneficiaries' behavior; and an amendment that shifts management and control of the trust assets away from the Beneficiaries and to the Appellees.

The Supreme Court found that "in this case," the Appellees should be allowed to "act in the interest of all the shareholders and to require that they be held to a corporate level fiduciary standard *when acting as directors*." (Citations omitted; emphasis supplied.) *Rollins II*, supra at 715 (2). We thus proceed, as directed by the Supreme Court, to apply "a corporate fiduciary standard when considering the trustees' conduct with regard to their management of the corporate family entities held within the trusts." *Rollins II*, supra at 716 (2). Using this standard, we must determine whether questions of fact remain for jury resolution on these issues.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

8

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" OCGA § 9-11-56 (c).

> Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010). See also *Morgan Enterprises, Inc. v. Gordon Gillett Business Realty, Inc.*, 196 Ga. App. 112, 112 (395 SE2d 303) (1990) ("On cross-motions for summary judgment, each party must show there is no genuine issue of material fact . . . and that each, respectively, is entitled to summary judgment; either party, to prevail by summary judgment, must bear its burden of proof").

"Establishing a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (Punctuation and footnote omitted.) *SunTrust Bank v. Merritt*, 272 Ga. App. 485, 489 (2) (612 SE2d 818) (2005). Fiduciaries, including those acting as corporate directors, officers, or managing

9

partners, fall within the ambit of the rule requiring them "to exercise the *highest degree of good faith* as to all matters connected with the property committed to their care." (Citation and punctuation omitted; emphasis supplied.) *Hanson v. First State Bank and Trust Co.*, 259 Ga. 710, 712 (5) (c), n. 4 (385 SE2d 266) (1989) (regardless of whether someone is called a trustee, managing partner, or director, "he occupies a fiduciary position. Equity abhors mere names, and looks to the substance") (citation omitted).

In this particular case, the Supreme Court decreed that we apply the "more deferential [fiduciary] standards that apply to the conduct of corporate entity managers." *Rollins II*, supra at 714 (2). Our statutory law requires directors and officers to discharge their duties as they believe "in good faith to be in the best interests of the corporation[,] and [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances." OCGA § 14-2-830 (a) (1), (2) (directors); OCGA § 14-2-842 (a), (1) (2) (officers).

The Appellees contend that the business judgment rule serves as a shield for actions they took at the entity level, protecting them from liability absent a showing of fraud or bad faith, and providing a presumption of good faith. Our Supreme Court recently discussed the scope of the business judgment rule in *Federal Deposit Ins.*

10

*Corp. v. Loudermilk*, 295 Ga. 579 (761 SE2d 332) (2014), finding that it shields officers and directors from most ordinary negligence claims as long as they made their decisions with diligence and good faith. Id. at 585-586 (1). The high court also recognized an "alternative statement" of the business judgment rule, which provides for a presumption that corporate directors who make business decisions "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company," but noted that this presumption may be rebutted by proof that the business decision "was made without good faith, due diligence, or deliberation." (Citation and punctuation omitted). Id. at 581 (1), n. 2. See also *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (III) (Del. 1993) (to successfully rebut good faith presumption, "a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty – good faith, loyalty, or due care") (citation and emphasis omitted).

(i) *Unilateral amendment of the RIF general partnership*. As outlined more fully in *Rollins I*, supra at 151-153 (2) (b) (i), the trial court denied partial summary judgment to the Beneficiaries as to their claims that the Appellees breached their fiduciary duties in unilaterally amending the RIF partnership agreement to

11

concentrate power in themselves and to permit non pro rata distributions at Gary and Randall's discretion rather than at the vote of the complete partnership.

As an initial matter, the Beneficiaries on remand rightly point out that the Supreme Court's opinion is cast entirely in light of *corporate* references, rather than references to other business structures such as partnerships. *Rollins II*, supra at 714-716 (II). As they note, the RIF is not a corporation but is rather a general partnership. However, we believe that the Supreme Court's opinion encompasses the Appellees' actions generally in their roles as business leaders – regardless of whether their per se titles are officer, director, or managing partner, and regardless of whether the Family Entity is a corporation or a partnership – and we proceed accordingly.

RIF was established not as a corporation, but as a general partnership. It remains a general partnership even after the amendment about which the Beneficiaries complain. The fiduciary duties applicable to partners and to officers and directors often are similar. Compare OCGA §§ 14-2-830 (a) (1), (2) (directors) and 14-2-842 (a) (1), (2) (officers) (must act in "good faith" in best interest of corporation with care an ordinarily prudent person in a similar position would use in like circumstances), *Brewer v. Insight Technology, Inc*., 301 Ga. App. 694, 696 (1) (689 SE2d 330) (2009) (corporate officer owes corporation "utmost good faith and

12

loyalty") with OCGA § 23-2-58 (partners must act toward other partners with the "utmost good faith"), *Conner v. Hart*, 252 Ga. App. 92, 94 (1) (a), n. 4 (555 SE2d 783) (2002) (same), *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 211 (1) (c) (707 SE2d 508) (2011) (partners must act with the "finest loyalty").

Despite the similarities between corporate and partnership fiduciary standards, there are differences. In some situations, the partnership standard appears more akin to the trustee standard. See OCGA § 14-8-21 (a) (a partner "hold[s] as trustee" any partnership-related profit derived without the other partners' consent). Pertinently, our Supreme Court has applied the business judgment rule only to officers and directors, and has not discussed its applicability or inapplicability in the context of a partnership. See *Loudermilk*, supra at 586 (1) (applying the business judgment rule to corporate officers and directors as well as to bank officers and directors). Other courts have found the business judgment rule inapplicable in a general partnership context because the rule is a function of the "unique corporate setting." See, e. g., *Henkels & McCoy, Inc. v. Adochio*, 138 F.3d 491, 502 (3d Cir. 1998) (citation omitted).

Gary and Randall signed the original RIF partnership agreement in their individual capacities and as "trustees" of the Beneficiaries' S Trusts. They also signed

13

the amended RIF partnership agreement in their individual capacities and on behalf of the Beneficiaries' S-Trusts using signature lines that, again, designate them as "trustees."[5]

> When, as here, the Supreme Court

> considers only a portion of the Court of Appeals' opinion and reverses, it is for the Court of Appeals to determine on remand whether the portions of its earlier opinion that were not considered by this Court are consistent with this Court's ruling. If such portions are consistent with this Court's ruling, then they become binding upon the return of the remittitur. If, however, such portions are not consistent with this Court's ruling, the Court of Appeals must enter an appropriate disposition concerning those portions that reconciles them with this Court's ruling.

*Shadix v. Carroll County*, 274 Ga. 560, 563 (1) (554 SE2d 465) (2001).[6]

---

[5] We note, again, that only Gary is actually a trustee of the S-Trusts. Randall is not.

[6] The Supreme Court granted certiorari on Division (2) (a) of our opinion, which addressed only which fiduciary standard to apply. *Rollins II*, supra at 712; *Rollins I*, supra at 146-150 (2) (a). We did not actually apply our chosen fiduciary standard until Division (2) (b), *Rollins I*, supra at 150-156 (2) (b) (i) - (iii). Following the rationale in *Shadix*, supra, we shall consider the portions of Division (2) (b) of *Rollins I* to which the Supreme Court's ruling may apply.

14

In the instant case, the Supreme Court directed that we apply the "corporate level fiduciary standard" to Gary and Randall's "corporate duties and actions," and that the Appellees could "be held to a corporate level fiduciary standard *when acting as directors*." (Citations omitted; emphasis supplied.) *Rollins II*, supra at 715-716 (2). Thus, a necessary precursor to the application of any fiduciary standard is a determination of whether Gary and Randall took the actions complained when they were "acting as directors." Id. Given the signature lines amending the RIF partnership, as outlined above, it is impossible for this Court to discern from the record before us in what capacity – trustee or managing partner (or both) – that Gary and Randall were acting when they made the unilateral RIF amendment at issue. This presents a preliminary fact question for resolution below.

Thus, our opinion in *Rollins I*, supra at 150-154 (2) (b) (i), addressing the unilateral amendment to the RIF partnership and the resulting changes in cash distributions and partnership control would therefore be consistent with the Supreme Court's ruling to the extent that the Appellees rendered the decision at issue in their capacity *as trustees* rather than as managing partners. To the extent that Gary and Randall's actions in amending the partnership agreement were taken in their capacity

15

*as managing partners,* such that a partnership fiduciary standard would apply, we would again find questions of fact.

OCGA § 14-8-18 provides that "[t]he rights and duties of the partners in relations of the partnership shall be . . . subject to any agreement between them[.]" The original RIF partnership agreement provides that while "[a]ny one of the Partners is authorized to execute documents on behalf of the Partnership[,]" the partnership agreement may be amended only "with consent of *all* Partners." (Emphasis supplied.)

Here, the Beneficiaries alleged that they neither "participated in" the amendment to the RIF partnership agreement "[n]or had any knowledge" of the amendment. They also alleged that Gary and Randall acted outside the scope of their authority in making and acting on such changes.[7] By contrast, Gary and Randall essentially argue that the S-Trust indenture, which provides that they may "join with other owners in adopting any form of management" for businesses in which the trust

---

[7] The initial partnership agreement provided that the partners, which would have included the Beneficiaries, Gary, and Randall, were not liable for any act they performed "within the scope of the authority conferred on them by this Agreement, except for their own acts of malfeasance, gross negligence, or *intentional misrepresentation*." (Emphasis supplied.) The unilaterally amended partnership agreement provides that managing partners – the roles assumed by Gary and Randall – have no liability "unless such error, mistake, action or inaction is due to such Managing Partner's wilful misconduct, gross negligence or bad faith."

16

has an interest, trumps the RIF partnership agreement and permitted such a unilateral amendment. Gary and Randall present evidence that the 1993 amendment's purpose, in part, was to allow non pro rata distributions to avoid capital gains taxes and thus there is no bad faith.

Given that the RIF agreement's original language – drafted while the settlor still was alive – provided for an amendment only with consent of all partners and mandated that all partners avoid intentional misrepresentation, there would be a clear factual dispute raising questions as to whether Gary and Randall exercised the utmost good faith in amending the RIF partnership and in sanctioning distributions which, they acknowledge, did not always include the Beneficiaries.

"Unquestionably, partners owe a fiduciary duty to one another." (Footnote omitted.) *Conner*, supra at 94 (1) (a). In the partnership context, this duty includes acting with the "utmost good faith and with the finest loyalty." (Citation and punctuation omitted.) *AAF-McQuay*, supra at 211-212 (1) (c) (upholding denial of summary judgment where fact question existed as to whether dominant partner, who was also a creditor of the partnership, used coercive and deceptive tactics to try to restructure partnership by, inter alia, secretly divesting partnership of one of its businesses). Partners have a duty to disclose all material information to one another,

17

as outlined in the pivotal and oft-cited case *Meinhard v. Salmon*, 249 N.Y. 458, 468-469 (164 NE 545) (1928), which finds that a managing partner or "coadventurer" was in a fiduciary relationship which rendered wrongful his action in keeping secret a new real estate lease because he thus removed from the other partner "the power of control and management which under the plan of the joint venture he was to have from first to last." Id. Specifically, OCGA § 14-8-20 provides "[p]artners *shall* render, to the extent circumstances render it just and reasonable, *true* and *full information* of all things affecting the partners[.]"[8] (Emphasis supplied.) Given that the original RIF agreement provided for amendment only with the consent of all partners, and the resulting "secret" amendment changed partners' distributions and voting power, it is difficult to conceive of how such an alteration could not be material and could not be subject to the "full information" requirement of OCGA § 14-8-20.

Further, in their loss of control and in potentially receiving lesser distributions as a result of the amendment, the Beneficiaries arguably were injured by the alleged breach of fiduciary duty. *Conner*, supra. Thus, were we to analyze the claim anew

---

[8] This Code section has never been construed. The comment to this Code section notes that it "differs from the official version [the Uniform Partnership Act] in explicitly requiring disclosure without the necessity of a demand[.]" The comment, which was prepared under the supervision of the State Bar of Georgia, is neither a statement of legislative intent, nor does it carry the force of statutory law.

under a partnership fiduciary standard, we would again find questions of fact necessitating that we reverse the trial court.

(ii) *Code of Conduct*. The Beneficiaries allege that Gary and Randall engaged in self-dealing and breached their fiduciary duties and duties of trust by creating a "fake distribution scheme" after the settlor's death. This distribution program, the Beneficiaries argue, allowed Gary and Randall to manipulate the income of each S Trust impermissibly by conditioning distributions on the Beneficiaries' adherence to a "code of conduct" that had no basis in a trust instrument. The Beneficiaries argue that they were tricked into agreeing to the code of conduct because Gary and Randall misrepresented themselves as "trustees" and, as such, had the power to make non pro rata – or even no – distributions as they saw fit. The result, the Beneficiaries argue, is that Gary and Randall acted in bad faith and in an arbitrary and retaliatory manner to deprive them of distributions, while rewarding other beneficiaries and themselves with distributions or redemptions in which the Beneficiaries did not receive their due share.

In *Rollins I*, supra at 154-156 (2) (b) (ii), we analyzed Gary and Randall's conduct under the trustee-level fiduciary standard and determined that the trial court erred in finding no fact questions as to whether they exceeded the scope of their

discretion in connection with this conduct-based distribution system. Pursuant to the Supreme Court's decision, we must now analyze the Beneficiaries' claims applying the "corporate level fiduciary standard" only where Gary and Randall were pursuing corporate "corporate duties and actions" when "acting as directors." *Rollins II*, supra at 715-716 (2).

Thus, a necessary precursor to any analysis of bad faith, breach of trust or breach of fiduciary duty is a determination of whether Gary and Randall were engaged in *corporate duties and actions*, as opposed to trustee-level duties and actions, and whether those actions were taken in their roles as trustees, as managing partners, or as corporate officers or directors. As will be discussed below, because fact questions remain as to which role Gary and Randall occupied when making the distributions at issue, we again reverse and remand this matter to the trial court.

The pertinent facts follow. In 2000, some years after the settlor's death, the Beneficiaries attended a presentation about a new "Family Entity Distribution Program," which, among other things, conditioned financial distributions on all nine beneficiaries' "100% attendance, preparation and meaningful participation" in quarterly meetings and engagement in "serious pursuits that are meaningful,

20

respectable and worthwhile in the opinion of the *Trustees*."[9] A document describing the distribution program, entitled "Rollins' Family Meetings' Code of Conduct, Attendance and Family Office Relations Policy" provides that "[t]he decision to make a distribution is at the *discretion of the Trustees* in accordance with the Program Guidelines." (Emphasis supplied.) The program documents also state that "should the *Trustees deem that a participant does not meet the requirements for a cash distribution* in any given year, the funds not distributed will remain in trust for the benefit of that specific Family Line[.]"

Some of the distributions at issue apparently were handled through RFA Management Co., a limited liability corporation, and involved distributions through or from Family Entities including the corporations LOR, Inc. and RHC, Inc., as well as the RIF partnership. Despite RFA and LOR's status as corporations, in connection with giving the Beneficiaries notice of the size of their "shareholder" distributions in certain years, Gary and Randall sent letters to the Beneficiaries identifying themselves as "Trustees of LOR" and "RFA Trustees."[10]

_____

[9] Distribution amounts also were determined based on investment performance, taxation, the beneficiaries' age, and other factors.

[10] Although the Beneficiaries' arguments and the evidence they present focuses almost exclusively on distributions from the RIF partnership, they do point to

21

Also, in a 2011 RIF partnership document entitled "Unanimous Consent of the Managing Partners of Rollins Investment Fund to Action Without a Meeting," Gary and Randall stated that

> R. Randall Rollins, as *trustee of The R. Randall Rollins trust*, created under agreement dated August 25, 1994, as amended, and Gary W. Rollins, as *trustee of The Gary W. Rollins trust*, created under agreement dated September 14, 1994, as amended, constituting all of *Managing Partners* of Rollins Investment Fund, a Georgia general partnership, ("RIF"), do hereby take the following actions by written consent in lieu of a meeting and consent to and approve the following resolutions[.]

(Emphasis supplied.) The resolutions included the decision to make multimillion-dollar distributions to the RIF partners, which potentially could have included all nine beneficiaries. The Beneficiaries specifically complain that they got no portion of a $9 million distribution from this resolution, and Randall deposed that this was so. . The resolutions also identified each distribution as a "Transaction" and provided that

> the *trustees*, *officers*, managers and partners *of RIF and its Managing Partners* be, and each of them hereby is, authorized and directed . . . to take any and all actions, as such *trustees*, *officers*, managers and

---

evidence that the Family Entities, including LOR, were combined into one distribution stream through RIF. They contend that through the powers Gary and Randall gave themselves in RIF, they reduced LOR dividends to the Beneficiaries dramatically resulting in retained earnings of nearly $1 billion in LOR.

22

*partners* shall deem necessary, desirable or appropriate in order to consummate the Transactions including without limitation entering into an administrative agreement with RFA Management Company, LLC or another service provider to effect and administer activities in furtherance of the Transactions.

(Emphasis supplied.) The signature block identifies Gary and Randall as "Managing Partners" and designates each as a "Trustee."[11]

The language and business structures described above are significant because the Beneficiaries argue that they were misled into accepting the strictures of the code of conduct by Gary and Randall's presentation of themselves as "trustees." They point to depositions where Gary and Randall acknowledged that, in fact, there are no trustees of LOR and RFA. Gary and Randall's designation of themselves as,

---

[11] As other evidence in their allegations of wrongfully inequitable distributions, the Beneficiaries also argue that, as part of other transactions, Gary and Randall received a total of $46.7 million from RIF between 1993 and 2011 (which would mean an average of roughly $23.3 million each). The evidence shows that during this time period, the Beneficiaries received a total of $53.5 million (which would mean an average of $13.37 million each) out of a total of $201 million in distributions and redemptions to the current RIF partners. We stress that the actual distributions were not, in fact, the averages listed above, which are provided only for the purpose of showing that the distributions were not equal on a per capita basis when comparing the Beneficiaries with Gary and Randall, and thus there could be some basis for the Beneficiaries' claims of harm in this regard.

respectively, The Gary W. Rollins trust and The R. Randall Rollins trust, is undisputed.

Gary and Randall defend their descriptions of LOR and RFA in the letters mentioned above, and their use of the term "trustee." They argue that "trust" was merely "shorthand" referring to the distribution program, and that the Beneficiaries understood this and were not misled. The record contains some evidence from which a jury could conclude that the Beneficiaries understood the actual structure of LOR and RFA, although as discussed above it also contains evidence that the Beneficiaries were kept in the dark and misled.

Further, Randall deposed that despite letters to the Beneficiaries indicating that distributions were being made to them as "shareholders" of RFA, the distributions were not funded with assets from the RFA corporation. Rather, when asked if the distributions were funded with "trust assets," he said yes. An RFA employee deposed that at least in recent years, funds for some distributions were sourced from the Beneficiaries' ownership interests in RIF and that the S Trusts hold some RIF interests.

As the evidence outlined above demonstrates, there are numerous fact questions as to what role Gary and Randall occupied when making the distribution

24

decisions of which the Beneficiaries complain, and that the distributions may have come from a variety of sources requiring Gary and Randall to adopt differing roles in their decisions underlying those distributions. Thus, not unlike a matryoshka, or Russian nesting doll, the particular distributions at issue potentially implicate decisions made by Gary and Randall in their corporate, partnership, and trustee capacities – or in some combination of all three roles.

Given the Supreme Court's decision in *Rollins II*, we must necessarily parse which role Gary and Randall occupied when they made the specific year-over-year conduct-based distribution decisions of which the Beneficiaries complain. However, to do so based on the evidence presented would be nothing short of an act of divination. This presents preliminary fact questions pertinent to each complained of transaction. This precludes our entry into any sort of analysis of the propriety of Gary and Randall's decisions under the three fiduciary standards potentially at issue. Because fact questions abound, a jury must determine which fiduciary cloak the brothers wore in regards to the distributions at issue.[12]

---

[12] In remanding this case, we empathize with the trial court regarding the extraordinary effort it will take to manage the presentation to and resolution by the jury of these complex and fact intensive issues.

25

4. *Action for an accounting against the Trustees*.

The RCT, by its terms, provides that the Beneficiaries receive periodic "statements disclosing [the] condition of the trust estate" not more often than every six months. The S-Trusts require that all trust income be distributed annually to the Beneficiaries, but do not address the issue of accountings.

As noted above, we initially reversed the trial court's decision related to an accounting, determining that the Beneficiaries were entitled to an accounting of the Family Entities controlled by the Appellees and held as trust assets. *Rollins I*, supra at 142-146 (1). The Supreme Court, noting that our original decision "may ultimately prove to be correct," directed that we reconsider the issue through the lens of whether the trial court properly exercised its equitable jurisdiction "by placing the sound discretion of the trial court on the scales." *Rollins II*, supra at 713-714 (1).

Trusts are, indeed, "peculiarly subjects of equity jurisdiction." OCGA § 53-12-6 (a).[13] "Equitable relief is generally a matter within the sound discretion of the trial court. The action of the trial court should be sustained on review where such discretion has not been abused." (Citations omitted.) *Prime Bank v. Galler*, 263 Ga.

[13] The Supreme Court of Georgia transferred this case to the Court of Appeals on July 12, 2012.

26

286, 288 (4) (430 SE2d 735) (1993). Here, the trial court used its discretion to determine that the trustees had breached their fiduciary duty by failing to provide annual accountings of the trust itself as required by OCGA § 53-12-243 (b) (1) and (2) and the RCT indenture. The trial court further used its discretion to deny all further relief on the issue of an accounting of the Family Entities held as trust assets.

The trial court, of course, did not make its determination in a vacuum. Rather, it exercised its discretion in light of its original finding that no fact questions remained for the jury as to whether the Appellees had properly managed the Family Entities within the trusts. Because we have determined in Division 3 that fact questions remain, we must remand the matter of the accounting to the trial court so that it may reconsider its decision and exercise its discretion in this new light.[14]

*Judgment reversed and case remanded with direction. Miller and Branch, JJ., concur.*

---

[14] Given our determination in Division 4, any analysis under *Shadix* of whether our decision at *Rollins I*, supra at 156 (2) (b) (iii) is implicated by the Supreme Court's decision in *Rollins II* is premature.