**FIRST DIVISION**
**DOYLE, C. J.,**
**ANDREWS, P. J., and RAY, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 27, 2016**

# In the Court of Appeals of Georgia

A16A0976. SAGER v. IVY FALLS PLANTATION DO-039 HOMEOWNERS ASSOCIATION, INC. et al.

DOYLE, Chief Judge.

Cynthia Sager appeals from an order granting partial summary judgment to Ivy Falls Plantation Homeowners Association, Inc. ("New Association"), in her suit against the New Association seeking, in part, a judgment declaring that the New Association lacks authority to collect homeowner association fees from her. Sager contends that the trial court erred by ruling that the New Association is a continuation of the original homeowners association. For the reasons that follow, we reverse.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable

conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[1]

So viewed, the record shows that a residential developer began building the Ivy Falls Plantation subdivision, which eventually comprised 109 lots, and in March 1996, a principal for the developer incorporated the Ivy Falls Plantation Homeowners Association, Inc. ("Original Association"). From April 1996 to September 1997, the developer recorded covenants and amended covenants that granted a membership interest in the Original Association to each lot owner. The covenants authorized the Original Association to collect dues from lot owners and perform certain other tasks on behalf of the subdivision. In July 2005, the Original Association was administratively dissolved by the Georgia Secretary of State.[2]

In October 2006, two subdivision residents filed articles of incorporation for an entity, the New Association, sharing the same name as the Original Association, and the New Association began functioning in the place of the Original Association.

---

[1] (Citation omitted.) *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[2] See generally OCGA § 14-3-1420 (grounds for administrative dissolution of a nonprofit corporation).

In July 2010, Sager purchased a home in the subdivision, and she later came to understand that she was considered a member of New Association. According to an affidavit by Sager, shortly thereafter, a majority of the residents voted to dissolve the New Association, and until 2013, the New Association did not conduct business or collect dues.

In May 2014, the New Association sent Sager a notice of dues assessment requesting payment of $100 plus a $10 late fee. Sager disputed the authority of the New Association to require her to pay dues, and the New Association eventually filed a claim of lien on her property for the dues, which claim was later cancelled. Sager sued the New Association and its officers, filing a verified complaint asserting claims for declaratory judgment, injunctive relief, slander of title, usury, and a civil Georgia Racketeer Influenced and Corrupt Organizations Act[3] violation. The defendants answered and filed counterclaims for declaratory judgment and money judgment for unpaid annual dues. All parties moved for partial summary judgment as to their claims for injunctive relief, seeking clarification on the authority of the New Association as successor to the Original Association. Following a hearing, the trial court ruled in favor of the defendants, holding that the New Association was the

_____

[3] See OCGA § 16-14-1 et seq.

3

successor in interest to the Original Association based on its "continuity of interest." Sager now appeals.

Sager argues that the trial court erred by holding that the New Association was essentially a successor to the old corporation as a matter of common law corporate continuity doctrine. We agree.

At the outset, we note that the parties do not dispute that the Original Association was administratively dissolved and not reinstated.[4] Under OCGA § 14-3-1421 (c), "[a] corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs . . . ." Thus, the dissolved Original Association could not continue its normal business, and we confine our analysis to whether the New Association was, as the trial court ruled, effectively the successor-in-interest to the Original Association.[5]

---

[4] See generally OCGA § 14-3-1422 (a) ("A corporation administratively dissolved . . . may apply to the Secretary of State for reinstatement within five years after the effective date of such dissolution.").

[5] The parties do not address, nor do we, whether the covenants, which are illegible in the appellate record, that encumber Sager's deed somehow subject her to the authority of the New Association.

The trial court relied on what it termed the "continuity of interest test," citing *Floyd v. Springfield Plantation Property Owners' Assn.*[6] and *Rice v. Lost Mountain Homeowners Assn.*[7] In *Floyd*, a case decided in 2000, this Court addressed Floyd's appeal from an order amending a 1992 judgment entered on a jury verdict awarding title to a shared water system to the Springfield Plantation Property Owners' Association, Inc. ("SPPOA"). SPPOA's claim to the water system was disputed by the original association, Springfield Plantation Homeowners' Association, Inc. ("SPHA"), which had been dissolved two years prior to the incorporation of SPPOA.[8] Seven years after the jury verdict, SPPOA obtained the amended judgment to clarify that it was the full successor in interest to SPHA and had authority to assess fees.[9] Some homeowners appealed, and this Court affirmed, explaining as follows:

> In order to reach its verdict [in favor of SPPOA], the jury must necessarily have found that SPPOA was the successor in interest to the prior homeowners' association. The original suit sought clarification of who owned the Springfield Plantation water system – SPPOA, the

---

[6] 245 Ga. App. 535 (538 SE2d 455) (2000).

[7] 269 Ga. App. 351 (604 SE2d 215) (2004).

[8] See *Floyd*, 245 Ga. App. at 535.

[9] See id. at 535-536.

developer, Floyd, or the individual property owners. To reach its verdict, the jury had to find that the developer transferred the water system to the original homeowners' association. And the only way that SPPOA would then have any rights to the system was if the jury found that it was the successor in interest to the earlier association. The trial court's recent amendment simply clarifies that result. It is not an improper modification or revision as no substantive rights are changed.[10]

Thus, the question addressed by this Court was whether the amendment was an improper modification, and the Court was not required to examine the underlying legal theory or facts supporting the jury's verdict in that case. The opinion recites some evidence presented at the hearing showing SPPOA's active functioning since its incorporation, but the Court does not specifically address the merits or elements of any continuity-of-interest doctrine.[11] As such, *Floyd* does not directly control the merits at issue in this case.

Next, in *Rice*, the Court addressed another case of competing homeowners associations. In 1989, the original developers of a subdivision created the Lost Mountain Homeowners Association ("LMHA"), which the Rices contended was only

_____

[10] Id. at 537 (4).

[11] See id. at 535-536.

6

intended to govern the first phase of the development.[12] A different association, the

Lost Mountain Township Association ("LMTA"), had been created in 1987 to govern

phases II and III, they argued, including their own home.[13] In 1996, a majority of all

lot owners in each of the three phases voted to designate the LMHA as the governing

entity. Nevertheless, in 2000, the Rices unilaterally created a rival association, the

Lost Mountain Township Homeowners Association, Inc.[14]

The Rices eventually disputed the authority of the LMHA to prevent them from

constructing an 11-foot-high white vinyl fence that violated the restrictive covenants

applicable to their lot. The LMHA sued and won, the Rices appealed, and this Court

affirmed. The Court addressed the question "whether or not LMHA . . . had authority

to govern the entire Lost Mountain Township subdivision consisting of all homes in

[p]hases I, II, and III."[15] The Court answered in the affirmative:

> [The fact that] there were other homeowner associations ceases to matter
> [because] the majority of the homeowners in the entire subdivision voted
> to have only one homeowners' association govern the subdivision rather

---

[12] See *Rice*, 269 Ga. App. at 351.

[13] See id.

[14] See id.

[15] Id. at 352 (2) (a).

7

than to have multiple competing associations. *The 1996 majority vote of all lot owners in the Lost Mountain Township subdivision was sufficient to have LMHA designated as the governing entity for the entire Lost Mountain Township subdivision*, even if LMHA was originally to govern only [p]hase I.[16]

Thus, the rationale in *Rice* was based on the majority vote of all of the members of the competing associations. Like *Floyd*, the analysis in *Rice* does not directly address the question of successor authority in the present case where there was no vote by a majority of the lot owners nor any act taken by the Original Association to transfer authority.

Other cases examining the status of a purported successor have arisen when a new entity refuses to honor the debts or liabilities of a predecessor. A classic example is in the products liability context, when a new entity seeks to avoid liability for an injury caused by a product made by an alleged predecessor. In this context, Georgia courts have stated the rule as follows: "Generally, a purchasing corporation does not assume the liabilities of the seller unless: (1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) *the purchaser is a mere continuation of the*

---

[16] (Emphasis supplied.) Id.

*predecessor corporation*."[17] "The latter of these circumstances refers to "the common law doctrine of corporate continuity[, which] applies where . . . there is a substantial identity of ownership and a complete identity of the objects, assets, shareholders, and directors. The corporate continuity doctrine is one of equity."[18]

The Court applied this doctrine to a homeowners association in *Dan J. Sheehan Co. v. The Fairlawn on Jones Condo. Assn., Inc.*[19] In that case, after a dispute arose about paying a contractor who did repair work for the association, the members of the original homeowners association voted at their annual meeting to amend the condominium declaration and bylaws to form a new association.[20] During the pendency of litigation over the payment, a new association was incorporated, the board voted to cease operation of the old association, *and the unit owners voted to adopt a restated condominium declaration that transferred responsibility for*

---

[17] (Emphasis supplied.) *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (328 SE2d 726) (1985).

[18] (Footnote, punctuation, and emphasis omitted.) *Dan J. Sheehan Co. v. The Fairlawn on Jones Condo. Assn., Inc.*, 334 Ga. App. 595, 597 (1) (780 SE2d 35) (2015).

[19] See id.

[20] See id. at 596.

9

*governing the condominium to the new association.*[21] When the new association argued that it was not liable for paying for the repair work procured by its predecessor, this Court held that the new association, which was different in name only, was a mere continuation of the old association.[22]

Here, in contrast to each of the above-cited cases, there has been no transfer of any assets, no vote to incorporate the New Association, nor any other act taken by a majority of purported members with respect to the New Association. An affidavit from an incorporator of the New Association admits that the original board did not realize that a new entity had been created until this litigation. Consistent with this, the record contains no evidence that the New Association took any action to complete the organization process, elect new board members or officers, or adopt new bylaws

---

[21] See id.

[22] See id. at 597 (1) ("[A]fter the [new association] was formed, it had the same purpose, same subject property, same board of directors, same officers, same voting members, same unit owners, same physical location, same registered office, and same authority to assess dues on the same people to pay for the same expenses. For practical purposes, nothing changed except the name of the association — the subject property did not change, the corporate composition did not change, the voting membership did not change, and the dues assessment capacity did not change.") (footnote omitted).

10

regarding governance and dues collection authority.[23] The only legal act reflected in the record is the mere filing of articles of incorporation of an entity with the same name. Thus, as in *Rice*, a competing association was formed, if only partially, but unlike in *Rice*, there was no participation by the membership or other authorized body in transferring any assets or governing authority to the New Association. Under the theory advanced by the New Association, anyone could file articles of incorporation for any entity at any time and, with nothing more, represent that it has governing authority over the subdivision. This is not what makes a competing association a successor under Georgia law, even under the doctrine of corporate continuity. In each of the cases relied upon by the New Association, there was some corporate act – typically a vote by members or a transfer of assets or authority by the original entity – that gave the new entity authority and linked the new entity to the old. But merely filing articles of incorporation for a new entity and calling it the governing authority

---

[23] See generally § 14-3-205 (a) (2) ("After incorporation . . . the incorporator or incorporators shall hold an organizational meeting at the call of a majority of the incorporators: (A) To elect directors *and complete the organization of the corporation*; or (B) To elect a board of directors who shall *complete the organization of the corporation*.").

was not enough to create a legally enforceable successor interest in the New Association.[24]

Therefore, as to the New Association's authority as under the doctrine of corporate continuity, we reverse the grant of partial summary judgment to the New Association as well as the denial of partial summary judgment to Sager on this question.

*Judgment reversed. Andrews, P. J. and Ray, J., concur*.

---

[24] Again, we emphasize that our holding is limited to the rationale provided by the trial court, i.e., that it was a successor only by virtue of the corporate continuity doctrine, not by virtue of some other authority or document.