**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 24, 2018**

# In the Court of Appeals of Georgia

A18A0266. MEDICAL CENTER OF CENTRAL GEORGIA, INC.   CWM-043
    v. MACON HEALTH CENTER, INC. et al.

MCMILLIAN, Judge.

Medical Center of Central Georgia, Inc.[1] (the "Hospital") appeals the trial court's denial of its motion for summary judgment in this action against Macon Health Center, Inc. ("Center") and Macon Health Club, Inc. ("Club") in connection with Center's and Club's right to exercise an option to lease a gym facility that the Hospital decided to close. The Hospital also appeals the trial court's partial grant of a motion for interlocutory injunction filed by Center and Club. Because we find no genuine issues of material fact preventing the grant of summary judgment and because the issues regarding the now-expired interlocutory injunction are moot, we reverse.

---

[1] The Hospital currently conducts business under the trade name "The Medical Center, Navicent Health."

Summary judgment is appropriate when the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law [.]" OCGA § 9-11-56 (c). "The party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact." (Citation omitted.) *Examination Mgmt. Svcs. v. Steed*, 340 Ga. App. 51, 51-52 (794 SE2d 678) (2016). "We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." (Citation omitted.) *Matson v. Bayview Loan Servicing, LLC*, 339 Ga. App. 890, 890 (795 SE2d 195) (2016).

So viewed, the evidence shows that under the terms of an agreement dated March 5, 1991 (the "Agreement"), the Macon-Bibb County Hospital Authority, d/b/a Medical Center of Central Georgia, a public, not-for-profit hospital (the "Authority"), bought the building containing the gym and the gym's equipment from Center, which, at the time, was doing business as the Macon Health Club. The Agreement granted the Authority the right to the name "Macon Health Club" and contemplated that the Authority would continue to operate a gym facility on the premises "so long as it can feasibly do so." The Agreement further provided that in the event the Authority failed to meet its obligations to maintain the gym or announced its intention to close the

2

facility prior to December 1, 2020, Center had the right to exercise a lease option for the gym property (the "Lease Option"). However, the Agreement also contained the following provision requiring that Center maintain its legal corporate standing (the "Good Standing Requirement") in connection with its exercise of the Lease Option:

> The parties recognize that the option hereby granted to [Center] to lease the premises up to December 13, 2020, contemplates that [Center] will remain a corporation in good standing under the laws of the State of Georgia. [Center], therefore, represents that it will take such action as is necessary through the form of annual filings with the Secretary of State or otherwise to maintain the corporate existence in good standing of [Center].

In 1995, the Authority assigned the Hospital title to the gym property and all of the Authority's rights and responsibilities under the Agreement pursuant to a lease transfer agreement. From that point, therefore, the Hospital and Center were the two parties to the Agreement. However, in 2001, Center, which was first incorporated in 1887, was administratively dissolved by the Georgia Secretary of State.

Seven years later, in August 2008, the Hospital, prompted by declining gym membership, began a financial and operational analysis of the gym and on October 1, 2008, made the administrative decision to close the facility. The Hospital sent a letter to Center's board members announcing this decision in October 2008. On

3

January 30, 2009, Club was incorporated as a new entity under the same name as Center, i.e., Macon Health Center, Inc.[2] Shortly thereafter, on February 5, 2009, Donald J. Cornett, the president of Club, signed a letter as "Chairman, Macon Health Center, Inc." responding to the Hospital's October 2008 letter informing Center's board about its decision to close the gym. In the letter, Cornett explained that

> [t]he purpose of this letter is to respond to your letter of October 7, 2008, to the Macon Health Center, Inc. Board announcing the intention of [the Hospital] to cease operating the Macon Health Club. Pursuant to the terms of Paragraph 11.04 of that Agreement dated March 5, 1991, between the . . . Authority. . . and Macon Health Center, Inc. ("MHC"), MHC hereby gives written notice to [the Hospital] of its intent to lease the space described . . . in the Agreement for a term ending December 13, 2020.

While the language of the letter purports to exercise the Lease Option on behalf of the entity the letter identified as a party to the Agreement, i.e., "Macon Health Center, Inc., ('MHC')," Cornett avers in this litigation that he sent the letter in his capacity as president of Club, which was not a party to the Agreement. On March 11, 2009, Cornett, on behalf of "MHC," and the Hospital jointly notified the gym's members of the Hospital's decision to cease gym operations and Club's intention to

---

[2] In 2017, Club changed its name to Macon Health Club, Inc.

4

exercise the Lease Option. The Hospital and Club continued to negotiate over the future of the gym, and on September 27, 2009, the Hospital and Cornett, again on behalf of "MHC," entered into a Memorandum of Understanding (the "Memorandum"), under which the Hospital agreed to continue operating the gym and Club agreed to assist in finding additional financing and increasing membership. Both Cornett and another witness averred that Cornett also signed that document in his capacity as an officer of Club, because, as Cornett explained, he "had no authority to sign for any other entity." Then, in 2012, Club, too, was dissolved by the Secretary of State for failure to file its annual registration.

Four years later, on September 13, 2016, the Hospital again announced its intention to close the gym. In response, Club successfully applied and received reinstatement of its corporate status as of September 26, 2016. Club also requested, and the Hospital agreed to, an extension of the date of the gym's closing to March 12, 2017. Negotiations continued regarding the possibility of a new lease, and Club made the decision to exercise the Lease Option. And on December 7, 2016, an attorney sent the Hospital a letter on behalf of "MHC" to notify it of this decision. The Hospital acknowledged receipt of this notice on December 9, 2016, expressing "hope for a resolution agreeable to the parties which serves the interest of the Community[.]"

5

However, the Hospital asserts that it believed it was negotiating with Center and only discovered for the first time in February 2017 that Center had been administratively dissolved in 2001 and that Club was a separate corporate entity. Shortly thereafter, the Hospital filed its Complaint for Declaratory Judgment in this action, asking the trial court to declare and affirm that:

> (a) because CENTER materially breached the Good Standing Requirement and is now a permanently defunct entity, CENTER lost the Option to Lease; (b) as a permanently defunct entity, CENTER may not assign the Agreement to CLUB; and (c) CLUB has no standing to exercise the Option to Lease.

Center and Club filed a timely answer, counterclaim, and verified petition for injunction to keep the gym in operation pending the litigation. Within a week and prior to any discovery, the Hospital filed its motion for summary judgment. The parties subsequently entered into a consent order in which the Hospital agreed to make its general counsel available for a deposition "on subject areas that relate to Defendants' claim of standing to enforce the 1991 agreement" and to keep the gym open through March 30, 2017.

Following a hearing, the trial court issued its order denying the Hospital's motion for summary judgment and granting Club's petition for an interlocutory

6

injunction to preserve the status quo until April 30, 2017. In reaching this decision, the trial court found that Center was administratively dissolved and was time-barred from seeking reinstatement of its corporate status. Nevertheless, the trial court found that

> reasonable minds could infer that a continued relationship with the same or [a] similar group of individuals acting on behalf of a historic corporation (now extinct) could in fact stand in the shoes and be authorized legally (through active or passive conduct) to continue such contractual operation under one or more versions of the facts presented in this case.

Citing the elements of a claim of promissory estoppel, the trial court identified factual issues arising out of the negotiations between Club and the Hospital in 2008 and 2009, during which the Hospital did not raise the issue of Club's standing under the Agreement. The trial court assumed, for purposes of summary judgment that the Hospital was aware that Club was a separate entity and that these negotiations were evidence that the Hospital "accepted [Club] into the fold[,]" thus precluding the grant of summary judgment. This appeal followed.

1. In related enumerations of error, the Hospital asserts that the trial court erred in denying its motion for summary judgment because Center breached the Good

7

Standing Requirement under the Agreement when it was administratively dissolved by the Secretary of State and because Club has no rights under the Agreement. Because we find that the trial court's denial of the Hospital's motion for summary judgment is not well grounded in the law, we reverse.

It is undisputed that Center and the Hospital were the only two parties to the Agreement at the time Center was administratively dissolved in 2001 and that Center's corporate status has not been reinstated. See OCGA §§ 14-3-1420; 14-3-1421; 14-3-1422. "A corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs. . . ." OCGA § 14-3-1421 (c). Therefore, pretermitting whether Center's corporate dissolution constitutes a material breach of the Agreement, Center is barred by law from conducting further business, and thus it is legally prohibited from exercising the Lease Option or continuing to operate the Gym.

Turning next to the issue of whether Club has any right under the Agreement to exercise the Lease Option, we find no valid legal theory to support a jury finding that Club has any such right. First, pretermitting whether Center could have transferred or assigned its rights in the Lease Option to a third party as a part of

8

winding up and liquidating its business, Club does not assert, and the record contains no evidence showing, that Center took any action to make such an assignment to Club or any other party.

Moreover, the fact that Club incorporated under the same name as Center with the intent of stepping into its shoes is not a sufficient basis for finding that the Club is vested with Center's contractual rights. See *Sager v. Ivy Falls Plantation Homeowners' Assn., Inc.*, 339 Ga. App. 111, 116 (793 SE2d 455) (2016). In *Sager*, this Court addressed an analogous situation, in which a new homeowner's association was formed after the first homeowner's association was administratively dissolved, and one of the homeowners contested the new association's right to collect homeowner's fees. Both associations were incorporated under the same name, but as the Court noted there was "no transfer of assets, no vote to incorporate the New Association, nor any other act taken by a majority of purported members with respect to the New Association." Id. Therefore, this Court found that the new association could not be deemed a successor in interest to the defunct association under "the common law doctrine of corporate continuity, which applies where there is a substantial identity of ownership and a complete identity of the objects, assets, shareholders, and directors." (Citation and punctuation omitted.) Id. at 115. See also

9

*Macedonia Baptist Church of Atlanta v. LIB Properties, Ltd.*, 307 Ga. App. 760, 763

(707 SE2d 380) (2011).

Likewise, the record in this case contains no evidence supporting a finding that

Club is the successor in interest to Center under the doctrine of corporate continuity.

There is no evidence of any identity of corporate ownership,[3] no transfer of assets,

and no evidence that either Center's Board or shareholders voted on the incorporation

of Club, an event that occurred more than seven years after Center's dissolution.

Thus, Club cannot be considered a successor in interest to Center for purposes of the

Agreement.

Club and Center argue, however, that the Hospital waived any right to contest

Club's standing to exercise the Lease Option when the parties entered negotiations

regarding gym operations in 2009 because the Hospital knew or should have known

at that point that Center was defunct and Club was a new corporation. The Hospital

denies any such knowledge and asserts that it did not discover that Center was

defunct and that Club was a newly organized corporation until February 2017. Club

---

[3] According to the Secretary of State filings included in the appellate record, Center, at the time of its dissolution, did not share any common officers or agents with Club at the time of its formation. However, James Marshall, who was identified in the Secretary of State's records as the CEO and registered agent of Center, averred that he later became the president of Club, after first serving as its pro bono attorney.

10

and Center, however, point to evidence in the record indicating that representatives or agents of the Hospital knew or should have known that Center had been dissolved and that Club was a new corporation, including: records from the Secretary of State's office reflecting each corporation's status at the pertinent times; the admission of the Hospital's general counsel that he never checked those records for Center's corporate status at the time of the 2009 negotiations, despite the Good Standing Requirement; local newspaper coverage in 2009 regarding the formation of Club as a "new organization," as part of an effort to keep the Gym open; and statements in 2009 by an officer of, and by an attorney representing, the Hospital arguably reflecting knowledge that Center no longer existed and that Club had been only recently formed.

Although we agree with the trial court that this evidence creates an issue of fact regarding the Hospital's knowledge of the true corporate status of Club and Center, we disagree that this conflicting evidence creates an issue of *material* fact sufficient to defeat the grant of summary judgment to the Hospital. Even assuming, for purposes of summary judgment, that the Hospital knew that Center was defunct and that Club was an independent corporation in 2009, we find no legal ground to support a finding

that the Hospital waived its right to insist on the Good Standing Requirement by not

raising it during the 2009 negotiations with Club, which is a stranger to the Contract.[4]

We also find it significant that the negotiations upon which Club bases its

claim of waiver resulted in the execution of a separate agreement, the "Memorandum

of Understanding," which provided, "It is understood that this agreement does not

require in any way either party to relinquish their rights as agreed to in the contract

signed March 5, 1991." Nothing in that statement creates new rights in the parties

under, or recognizes the substitution of a new party to, the Agreement; to the

contrary, it is clear that the Hospital and Club agreed that Hospital retained its rights

under the Agreement.[5] Therefore, even though the Hospital chose to negotiate with

---

[4] The cases upon which Club relies do not support the proposition that a party may be unilaterally waived into a contract with rights to enforce its provisions; rather, they address the waiver of contractual rights or defenses as between the existing parties to a contract. *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 218 (4) (a) (707 SE2d 508) (2011) (waiver of contractual rights between parties to a partnership agreement); *Park v. Fortune Partner, Inc.*, 279 Ga. App. 268, 271 (2) (a) (630 SE2d 871) (2006) (defendant debtors waived defense of failure of consideration to promissory notes held by a corporation); *Kusuma v. Metametrix, Inc.*, 191 Ga. App. 255, 257 (3) (381 SE2d 322) (1989) (the issue of whether the landlord's and tenant's mutual conduct caused a waiver and effected a quasi-new lease agreement ordinarily is a question for the jury).

[5] Cornett, acting as President of Club, signed the Memorandum of Understanding on behalf of "the Macon Health Club," even though it is undisputed that Club was not a party to the Agreement.

12

Club in 2009 to facilitate the continued operations of the gym, we find no evidence in the record of any implied or express promise by the Hospital granting Club the same or similar rights it granted to Center under the Agreement so as to establish a claim by Club to enforce a lease option under a theory of promissory estoppel or any other legal theory.

Accordingly, we find that the trial court erred in denying the Hospital's motion for summary judgment.

2. The Hospital also asserts that the trial court erred in issuing an injunction requiring that it keep the gym in operation until April 30, 2017. However, because the parties have not pointed us to any evidence indicating that the interlocutory injunction did not expire on that date,[6] the issue of whether the injunction was properly granted is moot. See *Holton v. Physician Oncology Svcs.*, 292 Ga. 864, 866 (1) (742 SE2d 702) (2013); *Kellman v. Guthman Laundry & Dry Cleaning Co.*, 147 Ga. 133 (92 SE 872) (1917).

3. The Hospital also asserts that the trial court erred to the extent that it found that the Hospital owed a duty to the gym's members. To the extent that the trial

---

[6] We note that the record contains an order denying a motion for temporary restraining order filed by Club and Center to maintain the status quo from May 1 to May 30, 2017.

13

court's order could be interpreted as making such a finding, we agree it would be error because the issue of the Hospital's duty to the gym's members was not before the trial court. The gym members were not parties to this litigation, which involved only three non-profit corporate entities and which was confined to issues relating to the respective rights of those three corporations.

*Judgment reversed. Ellington, P. J., and Andrews, J., concur*.